**AMERICAN ARBITRATION ASSOCIATION**

**COMMERCIAL ARBITRATION TRIBUNAL**

Nikola Corporation,

     *Claimant*,

  -against-

Trevor R. Milton,

     *Respondent*.

**AAA Case No. 01-21-0017-1964**

**DECISION AND**

**FINAL AWARD**

WE, THE UNDERSIGNED ARBITRATORS, having been designated in accordance with the arbitration agreement entered into between the above-named parties and dated September 20, 2020, and having been duly sworn, and having duly heard the proofs and allegations of the Parties, do hereby issue this FINAL AWARD, as follows:

Hearings in this matter were held from July 24 to August 2, 2023.  Claimant Nikola Corporation ("Nikola" or the "Company") was represented by Marc E. Kasowitz, Daniel J. Fetterman, and Daniel A. Saunders of Kasowitz Benson Torres LLP.  Respondent Trevor Milton ("Milton") was represented by Terence Healy, Shahzeb Lari, and James Boykin of Hughes Hubbard & Reed LLP.  After considering the Parties' arguments and post-hearing submissions, the Panel entered a Decision and Interim Award on October 20, 2023.  Panel member Jonathan J. Lerner issued a Dissent, Concurrence and Alternative Award.

The Panel's Interim Decision and Award invited the Parties to submit limited, additional briefing on: (1) Nikola's claim for legal fees and expenses in this Arbitration; (2) the amount of prejudgment interest Nikola could recover; and (3) the amount of post-judgment interest Nikola could recover.  (Interim Decision at 118-121; Interim Award at 2(F)-(H)).

The Parties submitted the requested additional briefing on October 31, 2023.

Having considered the Parties' supplemental briefing, the Panel now enters the following Decision and Final Award.

## BACKGROUND FACTS

In this Arbitration, Claimant Nikola is seeking to recover ████████████ ██ damages from Trevor Milton, the company's founder, largest shareholder, and public face after it became a public company on June 4, 2020. ████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████   ████████████

████████████████████████████████████████████

██████████████████████████

        ████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████   ████████

████████████████████████████████████████████

████████████████████████████████ The board of directors ultimately bestowed the title of Executive Chairman on Milton, who would

remain the public face of Nikola and to whom Russell would continue to report once he (Russell) became CEO.

███████████████████████████████████████████████████ By April 19, 2020, less than two months before Nikola went public through a reverse SPAC merger, ████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

██████████████████████████████████████ Two days later, Milton's improper social media posts about the merger ██████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

██████████ ████████████████████████ ████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████

Once public trading of Nikola's shares commenced on June 4, 2020, Milton's propensity for misstatement did not abate. ██████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████

████████████████████████████████

████████████████████   In addition, a short seller named Hindenburg Research LLC started writing a report to publicly expose Milton's false statements.  On September 10, 2020, those falsehoods were publicly disclosed in a report titled "*Nikola: How to Parlay An Ocean of Lies Into a Partnership With the Largest Auto OEM in America*" (the "Hindenburg Report").   ████████   The stock price dropped, and litigations and investigations ensued.   ████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████   He then went on a social media rant fairly describable only as unhinged.

██████████████████████████████████████████████████

████████████████████████████████████████ An agreement
was signed on September 20, 2020 providing the terms and conditions of Milton's
separation from Nikola, including an arbitration provision pursuant to which this
proceeding has been conducted (the "Separation Agreement"). ████████████████
████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

████

████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████

████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████

████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████

5



Hearings were held July 24, 2023 – August 2, 2023. Nikola called the following ██ fact witnesses to testify live:

---

1 A jury ultimately convicted Milton on three criminal counts and acquitted him on one count. *See* ██ (Jury Verdict Form, *USA v. Milton*) (finding Milton guilty of one count of securities fraud and two counts of wire fraud); ██ (Superseding Indictment, *USA v. Milton*, filed June 22, 2022). Milton filed a motion to set aside the guilty verdict and for a new trial, which the district judge denied by order dated August 30, 2023. Because the criminal case remains subject to appeal, it is not final. Accordingly, it has not been considered or given any substantive weight by this Panel, except as to the effect the lack of finality has on the ripeness of certain claims asserted against Milton in this Arbitration.



a.

b.

c.

d.

For the reasons set out below, we find that Milton violated his fiduciary duties of loyalty and good faith to Nikola, which caused damages to Nikola, and that Milton is liable for certain of those damages claimed by Nikola as described in the Decision.

## FACTS

### A.    The genesis of Nikola Motor Company

In 2012, Milton founded Bluegentech LLC, which by 2016 was doing business as Nikola Motor Company. ███████████ As discussed below, Milton remained Nikola's largest shareholder, highest-ranking executive, and *de facto* board controller the entire time he was associated with the company—even after it went public.

██████████████████████████ █████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████

    **B.**    **Milton's misstatements while controlling Nikola as a private company.**

██████████████████

██████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████

**-- The August 1, 2016 "Zero Emission" press release**

Milton still claimed to be all-in on CNG turbines as late as July 22, 2016, when he tweeted that "CNG is the way to go for power." (██ (Milton Tweet, dated July 22, 2016); ███ ██████████████████████████████████ ███████████████████████ But just days later, ████████ ████████████████████████████, Milton ███████████ ███████████████████████████████████████announced in an August 1, 2016 press release that Nikola had achieved "zero emissions" and had "engineered the holy grail of the trucking industry. ██ (August 1, 2016 Press Release); *see also id.* ("We knew our emissions would be low, but to have the ability to achieve true zero emissions is revolutionary for the worldwide trucking industry").  He made these statements even though CNG is incapable of achieving zero emissions. ████████████████████████████████████ ████████████████████████████████████████ ████████████████████████ Each of these statements was untrue. █████████████████████████████ ██████████████████████████████████ █████████████████████████████████████ ██████████████████████████████████ ████████████████████████████████████

10

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████

**-- Statements related to Nikola's hydrogen production capacities**

████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████  ██████  ████████████████████████

██████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████████████████████████████  ██

████████████████████████████████████

        ███████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████████████████████████[2]

---

2  Milton's misstatements about Nikola's hydrogen production capacities continued in the pre-public period.  For example, he repeatedly claimed at a Nikola-IVECO event on December 2, 2019 that Nikola had built a hydrogen production station, stating that Nikola "already [had] the largest

**-- The December 2, 2016 Nikola One event**

Milton's misstatements continued in the leadup to and during the Nikola One

unveiling event, which featured an inoperable prototype—not a functioning truck.

On October 16, 2016, for example, Milton falsely tweeted that the truck at the

unveiling event will be "functioning fully built truck" ███, ████████████

████████████. ████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████ ████ ████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

---

hydrogen station in the Western Hemisphere at [its] headquarters" and "[c]an produce over a
thousand kilograms [of hydrogen] a day on-site." ████████████  The following month, Milton
falsely tweeted that "[h]ydrogen costs have plummeted through [Nikola's] efforts…Our costs are
below $3 per kg." ████████  These statements were completely untrue. ████████████
████████████████████████████████████████████████████
████████████████████████████████

████████████████████████████████████████████████

███████████████████████████

      Nonetheless, Milton continued making false statements at the December 2, 2016 unveiling event, including the fundamental lie that the truck at his presentation "fully functions and works," "is a real truck" "[is] not a pusher" and was drivable. ██████████████ Milton repeated some of these same lies in a CNET interview the following day. ███████████ In reality, as Nikola's then-chief engineer, Kevin Lynk, clarified on day two of the unveiling event, the prototype was in fact a CNG prototype. ████████████████████████████

       ████████████████████████████████████

████████████████████████████████████████████████

███████████

      **-- The July 2017 "In Motion" video**

       █████████████████████████ ████████████████████████

████████████████████████████████████ ███████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

14

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████████████████ He commented on

Twitter: "Behold, the Nikola One in motion… The Nikola Hydrogen-Electric trucks

will take on any semi-truck and outperform them in every category." █████

████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████████████████

15

**-- The early 2020 unilateral announcement of The Badger**

In early 2020, while merger negotiations were ongoing, Milton unilaterally decided to announce the development of a consumer-focused pickup truck, the Badger. ██████████████ ████████ ████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████████████████████ Milton proceeded to publish the press release the following day, on February 10, 2020. ██████████

16

███████████████████████████████████████████████

██████████████████████████████

**C.      Nikola's transition to a public company**

**-- Russell joins Nikola in early 2019** ██████████████████

██████████████████████████

By February 2019, Nikola and Milton had successfully recruited Mark Russell

to join the company as President. ████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████   ██████████   █████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

██████████████████████████████████

      █████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████



Indeed, as Milton himself stated after Nikola went public: "I control the company, I control the board, I have the majority shares." ▮▮▮▮ (July 14, 2020 Observer Interview) at 5:6-8.

19



██  ████████████  ██████  ████████████████████████████████

████████████████████████████████████████

On June 4, 2020, Nikola's shares began trading publicly.

**D.      Milton's misstatements while controlling Nikola as a public company**

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

█████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

███████████████████

████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
█████████████████████████████████

██████

████████████████████████████████████████████████████████████ █

████████████████████████████████████████████████████████████

█████████████████████████████████████████████████

### -- Twitter statements

In a tweet on May 30, 2020, for example, Milton claimed that Nikola used "Wind solar and hydro for most" of its electricity and that Nikola is "[c]reating it [*i.e.*, hydrogen] on site under contracts" at "3 or 4 cents per kWh." ██████ ████████ ███ ████████████████████████████████████████████████████████ ██████. ████████████████.

Then, in a tweet on June 9, 2020, Milton claimed that Nikola was buying land for hydrogen stations and had secured competitive prices for clean electricity by "[s]ourc[ing] energy directly with either wind farms, solar, or hydroelectricity." (C86). This was also untrue. ████████████████ In additional tweets on June 9, Milton claimed that Nikola was producing hydrogen at less than $4 per kilogram. ████████ This too was not true. ████████████████████████ ████████████████████ ██ ████████████████████████ ████████ That same day, Milton also tweeted that "we have stations going up in Canada and they use clean energy for our hydrogen. Solar, Wind and Hydro give us under $4 per kg hydrogen." ██████ This was also false. ████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████

Milton also tweeted false statements about Nikola's in-house capabilities, claiming that Nikola produces its "own batteries . . . and ha[s] since day 1," ██████

June 4, 2020 Tweet), that "[a]ll the technology, software, controls, E axle, inverters etc. we do internally," (███ June 6, 2020 Tweet), and that "[a]ll major components are done in-house; batteries, inverters, software, controls, infotainment, over the air, etc." (███ July 5, 2020 Tweet). ████████████████████████

████████████████████████████████████████

█████████████   ████████████████████████   ████████   ████████████████

████████████████████████████████████████

██████████████████████████. ████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████

　　　　Finally, less than a week after the shares started trading, Milton unilaterally announced via Twitter that the company would begin taking orders for the Badger, Nikola's conception of a consumer-focused pickup truck. ████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████   ████████████████████████

███████████████████████████████████████

███████████████████████████████████████

██████████████████████████████████

### -- Podcast/interview statements

On top of his tweets, Milton also made misstatements during interview and podcast appearances during the summer of 2020.

In one June 3 appearance on the Tesla Daily podcast, for example, Milton repeated his misstatements about the price of electricity and hydrogen production and about Nikola's in-house capabilities.  (████ Tesla Daily Podcast Transcript). He also appeared the next day for an interview on Yahoo! Finance's The First Trade show, claiming that when Nikola "first started, hydrogen was $16 a kilogram.  We can now produce it for well under $4 a kilogram.  So we've cut - - it's one quarter of the cost now than it was just a few years ago.  And we're now cheaper to operate per mile than diesel."  (████ Yahoo Finance Transcript).  And a few days later, during a June 9 interview with Autoline After Houses, Milton lied more elaborately about hydrogen████████████████████████████when he claimed, "we make it on site."  (████ at 5:8-9, Autoline After Hours Transcript).

A few weeks later, during a June 29 appearance on Fox Business, Milton falsely claimed that for the Badger, "we take the water [byproduct], we filter it, and we send it right back up into the cabin to ice cold drinking water."  (████ These

claims were false.  ██████████  He repeated these claims the next day, during an interview with Maria Bartiromo on Fox Business.  (██████ June 30 Fox Business Transcript).  And during that interview, he also bragged about the impact his public statements were having on Nikola's rising share price.  (██████ at 5:22-7:15).  Specifically, in response to the interviewer's question about the reason for Nikola's surging share price, Milton answered: "There's unparalleled contact between myself, the executive chairman and the founder of Nikola, and all of our fans….And that's why you see the market evaluation of Nikola do well is because finally there's executives out there that they can talk to, that they can voice their problems, their opinions with and they actually get a response.  Go on my Twitter Nikola Trevor and you'll see." (██████ June 30 Fox Business Transcript).

Milton's misstatements continued.  During a June 29 appearance on the Raging Bull podcast, Milton repeated his false statements about Nikola's in-house capabilities, claiming: "The battery's actually done by Nikola.  We own all the tech, and we're building all the batteries in-house.  So it's all owned by Nikola." (██████ Raging Bull Podcast Transcript).)  These statements were false.  ██████████

████████████████████████████████████████████████████

██████████████████████████████████████  A few days later, during a July 3 interview on the Hitting the Mark podcast, Milton fibbed again about Nikola's hydrogen production.  (██████ Hitting the Mark Podcast

Transcript).  He also falsely stated that Nikola had launched a zero-emission truck and repeated his false claims about the Badger, including that there would be a "real truck" and not "some show truck" at the Nikola World event later that year.  (█████ Milton then repeated his false representations about hydrogen production and costs in a July 14 interview with the Observer.  (█████ Observer Interview Transcript).

On July 17, Milton made an interview appearance on the Tesla Charts podcast, during which he told numerous falsehoods.  (█████ Tesla Charts Podcast Transcript). These falsehoods included, among others:

- that Nikola had "chop[ped] the cost of hydrogen from $16 a kilogram down to, we're, we're down below $3 a kilogram on our hydrogen now," ████████████████████████████████████████

- that Nikola had built hydrogen stations for "14 million bucks" and that "the standardization of a hydrogen station was the most important aspect" of Nikola's reduction in hydrogen costs, ████████████████████ ██████████████████████████;

- that Nikola had "figured out how to stabilize the load balance" █████████ ████████████████████████████████;

- that Nikola had "tap[ped] directly into main federal transmission lines," and that "all" of Nikola's "hydrogen[ was] produced on the freeways," ██ ████████████████████████████████████████ ████████████████████████;

- that Nikola was "gobbling up" highway station locations and would have "700 of them in the US" within "the next seven years," █████████████ █████████████████████████.

███ ████ ███████████████████████

████████████████████████████████████

████████████████

Finally, in a July 31 appearance on This Week in Startups, Milton claimed that Nikola had "billions and billions of dollars in orders," which Milton stated were "[n]ot letters of intents, they're actually signed contracts." (████ This Week in Startups Podcast Transcript).  He continued: "So I want to be clear about that cause a lot of people have thought that it's just like, a non-committal thing, it's not.  These are like, sign on the dotted line." (*See id.*).  This was a categorical ███████ falsehood. ████████████████

**-- The share price rises in connection with Milton's misstatements,** ███████████████████████

████████████████████████████████

██████████████████ By July 7, 2020—one month after trading began— Nikola's stock had risen 400% from the initial $10 per share price to $40 per share.

████████████████

████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████





███████████████████████████████████████████

███████████████████████████████████████

### E.    The whistleblower

In the meanwhile, the public trading of Nikola's shares caught the attention of a man named Paul Lackey ("Lackey"), an engineer for a company called EVDrive that had worked with Nikola on developing the Nikola One prototype back in 2015 and 2016.  (Crim Tr. at 14:6-16:21).  Mr. Lackey had personally worked on the prototype and had worked directly with, and knew, Milton during that time.  (*Id.* at 3:15-4:5).

In June 2020, aware that Nikola was "open for anybody to invest in it" and knowing "that your typical everyday investor had nothing to go on other than the public statements by the company," Lackey "felt like it was very important for [investors] to know that …  Mr. Milton had a history of saying false statements." (Crim, Tr. Designations 149:1-11.)  Specifically, as Lackey later testified at Milton's criminal proceedings, Nikola One was not functional at the time of the Nikola One unveiling event, contrary to Milton's repeated lies, and it was never a "zero emission" truck as Milton claimed.  (████ Excerpted Lackey Tr., at 6:2-4; 6:18-24; 18:22-21:9).  In June 2020, Lackey contacted reporter Ed Ludlow ("Ludlow") at Bloomberg to apprise him about these misstatements.

On June 17, 2020, Bloomberg published an article about Milton and Nikola titled "Nikola Founder Exaggerated the Capability of His Debut Truck." (█████.) The second bullet under the title says, "'I never deceived anyone,' Trevor Milton says in an interview." (*Id.*) The article then states that at the December 2016 Nikola One debut, Milton made several comments to the crowd suggesting the Nikola One was drivable. The statements "alarmed people familiar with the Truck's capability, who told Bloomberg News recently that it was inoperable and missing key components to power itself." (█████.) Lackey provided that information. (Crim Tr. designations at 163:6-15). The article also states that "[o]n Wednesday, Mr. Milton said key parts were taken out of the vehicle for safety reasons" (█████), but Lackey testified that he did not recall "removing parts from the truck before the unveiling." (Crim Tr. designations at 163:16-21).

In response to the Bloomberg article, Milton doubled down on his previous misstatements about the Nikola One prototype, tweeting a link to the article and writing on June 17: "Everyone at the event knew that we didn't drive it because it wasn't safe….The truck built could have been driven with testing." (Cr. Tr. at 165:6-9). But Lackey testified unequivocally that "the truck that was built at the time of the time of the unveiling" could not be driven (*id.* at 165:10-12) and made clear that Milton's statement that it could be driven "but it was not safe" was false because "it

could not be driven and we had not reached the point where you would start evaluating safety." (Cr. Tr. at 167:16-22).

Finally, during his interview with Ludlow/Bloomberg, Milton stated falsely that "[w]e had all the components in it to make that truck run, including eAxles." (Cr. Tr. at 167:7-8). According to Lackey's testimony, this statement also was entirely false:

> Q. At the time of the unveiling did the truck, the Nikola One, have all of the components in it to make it run?
>
> A. No, it did not.
>
> Q. Did it have the complete eAxles in it?
>
> A. No, it did not.
>
> Q. What was it missing?
>
> A. They were missing all the internal components.
>
> (Cr. Tr. 167:9-15).

The day after Milton's tweet, Lackey published a tweet in response using his anonymous account. (Cr. Tr. 185:13-20). He did so because he viewed Milton's tweet as "doubling down and saying more things I considered to be untrue, so I wanted to get more facts out as best as I could." (Cr. Tr. at 185:21-186:1). In the anonymous tweet, Lackey said: "Coming soon, the facts about Nikola One development from an insider who was there. Spoiler alert, Trevor Milton is a congenital liar." (Cr. Tr. 186 3-5).

Lackey testified that in late July 2020, a whistleblower group contacted him on Twitter.  (Cr. Tr. at 189:3-10).  By that time, the group had already been working on a whistleblower complaint covering Milton's lies.  (*Id.* at 189:11-20).  Lackey joined the other whistleblowers in filing a complaint with the SEC in part because "in meeting with the other whistleblowers, [he] came to the understanding that there was further wrongdoing that had been done by Mr. Milton."  (*Id.* at 190:18-23).  Later, Hindenburg Research, which had been doing its own investigation of Milton, would also join the whistleblower group.  (*Id.* at 191:7-20.)

## F.    The Hindenburg Report

The Hindenburg Report was published on September 10, 2020.  It disclosed multiple false and misleading statements made by Milton both before and after Nikola shares began trading publicly.  (█████████

The report begins with a series of bullet points summarizing the substance of the report, each of which is focused on Milton's personal misconduct.  The first bullet point, for example, states that "[t]oday, we reveal why we believe Nikola is an intricate fraud built on ***dozens of lies over the course of its Founder and Executive Chairman Trevor Milton's career.***"  (*Id.* at 1, emphasis added).  The second bullet point notes that the report was based on "evidence—including recorded phone calls, text messages, private emails and behind-the-scenes photographs—of dozens of false statements ***by Nikola Founder Trevor Milton***.  (*Id.*, emphasis added).  The

third bullet point states that "***Trevor*** has managed to parlay these statements made over the course of a decade into a ~$20 billion public company." (*Id.*, emphasis added). And the fourth bullet point notes that the report would "examine how Nikola got its early start and show how ***Trevor*** misled partners." (*Id.*, emphasis added).

The headings throughout the Hindenburg Report also confirm that it was directed at Milton's false statements. For example, the Hindenburg Report contains the following headings, among others:

- Trevor Had "H2" Stenciled on the Truck Despite the Truck Apparently Having Zero Hydrogen Capabilities

- Trevor had H2 stenciled on the side of the Nikola One despite the reality that the Nikola One contained a turbine designed for natural gas and absolutely zero hydrogen technology whatsoever, according to our sources.

- The Truck Could Not Power Itself, Let Alone Drive, So an Electric Cable Was Snaked up Through the Stage.   / Trevor: The Truck is "Fully Functioning"

- December 2016: The Big Nikola One Reveal — "This Truck is By Far the Most State of The Art Truck Ever Built in History…This Thing Fully Functions and Works…This is a Real Truck—This is Not a Pusher" / Reality: It Was Not A Real Truck And Was, In Fact, A Pusher

- Bloomberg Later Identified That the Truck Was NOT Completed. / Trevor Responded by Admitting This, Then Claimed He NEVER Said it Was Completed (Despite Video Clearly Contradicting Him).

- Using Worthington's Credibility, Trevor Then Apparently Made False Claims About Nikola's "Proprietary" Technology in Order to Induce Partners to Work with Him

- April 2019: Trevor Claimed on Video That Nikola's Headquarters Was Completely Off the Grid, with 3.5 Megawatts of Solar Installed on Its Roof

39

/ Reality: There Were No Solar Panels.  The Lack of Panels Is Corroborated by Local Media and Subsequent Pictures

- July 2020: Trevor on the Nikola "Tre" Truck: "We Have 5 of Them Coming Off the Assembly Line Right Now" Bosch Spokesperson In September: We Don't Have Any Yet

- Nikola's Director of Hydrogen Production/Infrastructure Is Trevor Milton's Brother, Who Worked Paving Driveways in Hawaii Prior To Joining at Nikola

- Trevor Milton in 2020: We Make All Our Inverters In-House Reality: Nikola Buys Inverters from a Third-Party Supplier.  A July Video Shows the Inverter, but the Label of the Manufacturer is Covered with Masking Tape

- When Pressed on the Subject in July 2020, Trevor Acknowledged Nikola Produces No Hydrogen at All.  The Claims Made at Nikola World and In Multiple Interviews Were, Once Again, Completely Fictitious

- Nikola Intended to Acquire the Battery Tech, But After the Grand Announcement, Soon Learned it Was Vaporware.

- Despite Learning About the Issues with the Battery Tech in December 2019, Trevor Was Still Hyping the Tech in February 2020

- 2020: Trevor Claimed Nikola Produces Hydrogen for Under $3/kg,~81% Cheaper Than the Rest of The World, Representing a Major Breakthrough.



**-- Milton Tweets "Fuck the Haters"**

Less than two hours after ████████████████████████████████
████████████████████████████████████████████████ Milton

tweeted photos of Nikola trucks at 7:53 a.m., stating: "These were planned to release

later but alleged trucks didn't exist in Ulm Germany.  Do these look fake?  Thanks

to the Ulm fab / assembly teams for showing the trolls what's up.  You guys have

my admiration.  F@&k the haters.  Well [sic] come back stronger from the lies spread

about us." (████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████

**-- Livestream**

Later that same day, Milton went on an Instagram Livestream, stating, among

other things, that "the SEC is not investigating us" and that "it's all bullshit." (██

██) Other unhinged ████████████ statements included:

- "So let me tell you this.  As soon as that hit, what we did is we went straight
  to the SEC, and we said, 'Look,' it was the day after, you know, so it was
  this morning.  But what we did is we said, 'Look, SEC we want you to
  seek everything.' I had been working for 24 hours on this rebuttal.  *I had
  everything lined up and we hired a big outside firm and they came in and
  said, 'Not a chance.  You are not going to go rebuttal this to the whole
  world, Trevor.' And I was like, 'Yeah I am.  And uh, I was like, yes I am,'
  and they were like, 'No, you're not.' And then all of a sudden my whole
  executive team (starts to laugh) is like, 'Hell no you're not', and I'm like,
  'Why guys? You've got to hit this stuff straight on.'*" ████████████████
  ████████████ ██████ ████████████████████████

- "*. . . No, the SEC is not investigating us.  No, it's all bullshit.*"  ( ███████ ███████████████ ████████ ████████████████████████ )

- In response to an Instagram user's written comment: "Can't wait till you prove Cramer wrong," Milton said: "I agree, that was really bad.  Coming from him, I know he's really personality wise.  But I'll be honest, that was a really sad hit job by him today.  He didn't even bother calling to ask any questions, just a total hit job.  Coming from worldwide CNBC, I was kind of surprised . . .  *Because no, the truck is not fake.  No it's not Theranos.  Yes we've been vetted by the biggest groups in the world.  No, there's no SEC investigation.  No, there's no problem.  We went to the SEC and said, 'Look, this is all bullshit.*  Here's all the proof, and here's contracts to prove it.  Here's emails and by the way, here's everything corroborating our side about what this guy lied about.' So pretty cool, OK." ████████ ███████████████████ ████████ ████████████████████████ ████████

- In response to an Instagram user's written question: "*What's your stock goal at the end of the year?*" Milton said: "*I don't ever look at that, but hopefully better than today.*" ████████████████████████ ████ ████ ████████████████████████████

- In response to an Instagram user's written comment: "I can't believe your brother is a concrete worker, he's in charge of hydrogen," Milton said: "This is one I want to address right now.  I'm going to be real clear – this has nothing to do with my brother, it has everything to do with everybody.  *Any of you ass holes ever in this world think that someone is less than you because they don't have a degree, go fuck yourself.  That's my answer to you, OK? Go fuck yourself.*  You're no better than anyone because of your degree.  You're not better than anyone in this world because you've got some fucking degree.  This is the thing that drives me nuts . . ." ████████████████████████ ████████ ████████████████████ ████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████

## H.    Milton negotiates a separation agreement and departs Nikola amid regulatory investigations and civil lawsuits

████████████████████████████████████████████████

███████████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████  █████████  ███████████████

██████████████████████████████████████████████████

████████████████████████████████████████████████████

█████████████████████████████████████   According to

Nikola's public SEC filing, "On September 20, 2020, Mr. Milton offered to voluntarily step down from his position as Executive Chairman, as a member of the Company's board of directors, including all committees thereof, and from all positions as an employee and officer of the Company.  The board accepted his resignation and appointed Stephen Girsky as Chairman of the board of directors."

███████████████

### -- The Separation Agreement

That same day, September 20, Milton and Nikola entered into a detailed Separation Agreement (the "Separation Agreement").  By this time, Nikola was fully aware that the SEC and the U.S. Attorney's Office were actively investigating it and

Milton.   (███████).[5]   As Nikola publicly reported, "On September 14, 2020, the Company and five of its officers and employees, including Mark Russell, our Chief Executive Officer, received subpoenas from the Staff of the Enforcement Division as part of a fact-finding inquiry related to aspects of the Company's business as well as certain matters described in the Hindenburg Report."   ██████████████   And by the next day (September 15, 2020), six putative class actions had also been filed against Nikola and its current and former officers and directors.   Those lawsuits asserted violations of Section 10(b) of the Securities Exchange Act of 1934 and alleged, among other things, that the Company's public filings contained false and misleading statements regarding the Nikola's business plans and prospects.   ███████
████

The Separation Agreement unequivocally provides that Milton agreed to voluntarily resign and relinquish all his positions with the Company.   ██████   According to the recitals, "the Executive [Milton] desires to voluntarily step down from his positions as Executive Chairman of the Company and a member of the Board as of September 20, 2020 (the 'Effective Date') and the Board, after deliberation, has accepted such offer to step down." (*Id.* at 1).   Indeed, the first substantive paragraph is entitled "Voluntary Relinquishment," and it states: "The

---

[5] NASDAQ also conducted an inquiry, as did the Manhattan District Attorney.   ██████████ ██
██ ████████████████

parties agree that the Executive's relinquishment of his employment is not a termination of the Executive by the Company for purposes of any of the Executive's arrangement or otherwise."  (*See also id.* ("The Executive hereby *voluntarily* hands over and otherwise relinquishes, and the Company accepts his relinquishment of, his position as Executive Chairman…and his position as a Director on the Board….").

In the Separation Agreement, Milton also agreed to provide unpaid consulting services to the Company as requested through December 3, 2020 (Paragraph 2). Milton also agreed to relinquish 4,859,000 performance-based stock units granted to him only thirty-days before and any opportunity to enter into a two-year consulting agreement with an annual fee of $10,000,000 (Paragraph 3.)

In return, Nikola made certain commitments to Milton.  Among other things, the Company agreed to "comply with all indemnification and advancement obligations it has pursuant to the Indemnification Agreement dated June 3, 2020 by and between the Company and [Milton]."  ▮▮▮ at Para. 4(ii)).  In Paragraph 8 of the Separation Agreement, the Company also provided a broad release to Milton, releasing him from "any and all claims, agreements, obligations, demands and any causes of action, known or unknown, suspected or occurring at any time and prior to and including the date the Company signs this agreement…." (▮▮▮ at Para. 8). However, that paragraph excludes from this broad release "claims for fraud, securities laws violations, criminal acts or rights under or to enforce this Agreement,

46

the Restrictive Covenants Agreement and the Lock-Up Agreement or any act for which the Executive [Milton] is not entitled to indemnification from the Company." (*See id*).

Finally, the Separation Agreement contains an arbitration provision applicable to any dispute arising out of, related to or in any way connected with "any relationship between the Executive [Milton] and the Company (or between the Executive and any officer, director, employee or affiliates of the Company, each of which is hereby designated as a third-party beneficiary of this Agreement regarding arbitration…." (█████ at Para. 20). It also makes clear that "This arbitration provision is not intended to modify or limit substantive rights or the remedies available to the parties…" *See id.*

This Arbitration is being conducted pursuant to the Paragraph 20 jurisdiction.

██ ████████████████████████████████████████████████

████████████████████████████████████████

### -- The Indemnification Agreement

As noted, the Separation Agreement expressly incorporates the parties' Indemnification Agreement. ████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

47

48



**ANALYSIS**

In deciding the issues before us, the Panel first considers whether Nikola has proven its claim for breach of fiduciary duty by Milton. Concluding that Milton breached his fiduciary duty to Nikola through a pattern of false and misleading public statements, we next consider the application of ███████████ ████████████████████████████████████████████████████████████ █████████████████████████████████████ Finally, we turn to an analysis of the various damages claimed by Nikola. In this analysis we separately consider whether Nikola can recover (a) damages for legal fees ███████████████ ███████████████████, (b) the $125 million fine Nikola paid to the SEC, and (c) other claimed legal fees and related professional expenses. We also address Nikola's claims for disgorgement, interest, and attorneys' fees, as well as whether Nikola's recovery should be offset by its directors and officers liability insurance.

## I.  Nikola's Claim for Breach of Fiduciary Duty

### A.  Elements of Breach of Fiduciary Duty

A claim for breach of fiduciary duty under Delaware law includes only "two formal elements: (i) the existence of a fiduciary duty and (ii) a breach of that duty." *Basho Techs. Holdco B, LLC v. Georgetown Basho Invs., LLC*, C.A. No. 11802-VCL, 2018 WL 3326693, at *23 (Del. Ch. July 6, 2018), *aff'd sub nom. Davenport v. Basho Techs. Holdco B, LLC*, 221 A.3d 100 (Del. 2019).

Under Delaware law, a corporation's officers and directors stand in a fiduciary relationship with the corporation itself. *See Gantler v. Stephens*, 965 A.2d 695, 709 (Del. 2009). This relationship creates a "triad" of duties: loyalty, good faith, and due care. *Emerald Partners v. Berlin*, 787 A.2d 85, 90 (Del. 2001). There is no dispute that Milton—and the other directors—owed Nikola these fiduciary duties. *See Emerald Partners*, 787 A.2d at 90; *Gantler*, 965 A.2d at 709. Likewise, the officers of Nikola, who were not members of the Board, such as Brady and Worthen owed Nikola these same fundamental duties. *Metro Storage Int'l LLC*, 275 A.3d at 842 ("The Delaware Supreme Court has held that a corporate officer owes the same fiduciary duties as a corporate director.").

The fiduciary duty of loyalty requires that directors and officers be disinterested and independent and act in good faith, with an honest belief that the action is in the best interests of the company and its stockholders. *City of Fort Myers Gen. Emples. Pension Fund v. Haley*, 235 A.3d 702, 721 (Del. 2020); *In re Walt Disney Co.*, 907 A.2d at 751 (the duty of loyalty, in essence, "mandates that the best interest of the corporation and its shareholders take precedence over any interest possessed by a director, officer or controlling shareholder and not shared by the stockholders generally"). Although "[t]he standard of loyalty is measured by no fixed scale," the duty of loyalty "requires an undivided and unselfish loyalty to the

corporation" and "demands that there shall be no conflict between duty and self-interest."  *Guth v. Loft, Inc.*, 5 A.2d 503, 510 (Del. 1939).

The duty of good faith, which may be characterized as a subset of the duty of loyalty, *Stone ex rel. AmSouth Bancorp. v. Ritter*, 911 A.2d 362, 369-70 (Del. 2006), requires that directors and officers "act at all times with an honesty of purpose and in the best interests and welfare of the corporation," *In re Walt Disney Co.*, 907 A.2d at 755.  Bad faith (or lack of good faith) occurs when a fiduciary acts in a manner "unrelated to a pursuit of the corporation's best interests.  It makes no difference why the director intentionally fails to pursue the best interests of the corporation. Bad faith can be the result of any emotion [that] may cause a director to [intentionally] place his own interests, preferences or appetites before the welfare of the corporation, including greed, hatred, lust, envy, revenge, . . . shame or pride." *Id.* at 754 (internal quotation marks and citations omitted).

A failure to act in good faith may be shown where, as here, the fiduciary intentionally acts with a purpose other than that of advancing the best interests of the corporation, where the fiduciary violates applicable positive law, or where the fiduciary subjects the company to liability.  *See, e.g.*, *In re Walt Disney Co.*, 907 A.2d 693, 756 (Del. Ch. 2005); *In re McDonald's Corp.*, 289 A.3d at 380-81.

The fiduciary duty of due care requires that directors and officers "use that amount of care which ordinarily careful and prudent men would use in similar

circumstances and consider all material information reasonably available in making business decisions." *In re Walt Disney Co. Derivative Litig.*, 907 A.2d at 749; *see Smith v. Van Gorkom*, 488 A.2d 858, 872 (Del. 1985) (duty of care requires that directors inform themselves "prior to making a business decision, of all material information reasonably available to them").

### B.    Nikola's Claim for Breach of Fiduciary Duty

The Panel concludes that Milton violated his fiduciary duties of loyalty and good faith to Nikola through a pattern of false and misleading public statements about Nikola's products and the state of their development[6] and by subordinating the Company's interest to his own by refusing to all efforts to review and approve his public statements in advance.[7] ████████████████████████████

████████████████████████████████████████████████████████

███████████████████████████████

---

[6]  Milton consistently made false and misleading statement about, among other things: (1) the Nikola One prototype ████████████████████████; (2) the Company's purported production of hydrogen and hydrogen stations ████████████████████; (3) Nikola's plans for and development of a zero-emissions consumer-focused truck, the "Badger" ████████; (4) Nikola's development of in-house technology ████████████; and (5) Nikola's product reservations ████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████

[7]  Having found that Milton breached his duties of good faith and loyalty to Nikola, the Panel does not reach whether Milton breached his duty of due care.

The record in this proceeding abounds with evidence establishing that Milton

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

██████████████████████████████████.[8]s ████████████████████████

████████████████████████████████████████████.[9] ██████████████

---

[8] ████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████
██████████████████████████

Further, the Panel finds adverse inferences are appropriate here.  It is not disputed that adverse inferences may be drawn when a witness invokes the Fifth Amendment and refuses to testify in a civil proceeding.  *See Baxter v. Palmigiano*, 425 U.S. 308, 318.  Here, the Panel exercises its discretion to draw such adverse inferences, given that there is "independent evidence of the fact[s] about which [Milton] refuses to testify," as described in this Decision.  *Nationwide Life Ins. Co. v. Richards*, 541 F.3d 903, 911-12 (9th Cir. 2008).  Additionally, there is a "substantial need for the information," and there is no less burdensome way of obtaining information ███████████████████
███████████████ *Id.* █████████████████████████████████████████████
███████████████████████████████████████████████████████████

███████ As a result, the Panel exercises its discretion to draw adverse inferences here, where ███████████████████████████████████████████████████████
████████████████████████████████████████████████████

[9] ████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

████████████████████                    ████████████████████████

Delaware courts routinely hold that such conduct constitutes quintessential bad-faith behavior and breaches of the duty of loyalty.[10]  *See, e.g.*, *Metro Storage*

████████████████████████  
███████████████████████████████████████████████  Accordingly, the record fully supports the conclusion that Milton breached his duties of loyalty and good faith.

[10] ████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
███████████  ██████████████████████████████████
██████████████████████████████████

████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████  ████████  ████████████████████████

████  Milton's conduct epitomizes the type of "continuing wrong" that extends the statute of limitations.  "If there is a continuing wrong, the case is timely so long as the last act evidencing the continuing wrong falls within the limitations period.  To plead a continuing wrong the plaintiff must allege the various acts are so inexorably intertwined that there is but one continuing wrong."  *Frederick Hsu Living Trust v. ODN Holding Corporation*, 2017 WL 14373, 28 (Del. Ch. 2017).  That is the case here, ████████████████████████████████████████████
████████████████████

*Int'l LLC*, 275 A.3d at 848 (officer "violated his fiduciary duty of loyalty by placing his own interests and the interests of his other clients ahead of the Companies' interest"); *In re Syncor Int'l Corp. S'holders Litig.*, 857 A.2d 994, 997 (Del. Ch. 2004) (founder's misconduct, which caused the company to become the "focus of multiple criminal and civil proceedings," injured the corporation and constituted a breach of the duty of loyalty); *Jeter v. RevolutionWear, Inc.,* No. CV 11706-VCG, 2016 WL 3947951, at *1 (Del. Ch. July 19, 2016) (allegation that fiduciary made knowingly false statements to investors about the company to encourage investment stated claim for violation of duty of loyalty and good faith).

████████████████████████████████████████████████████████

████████████████████████████████████████████.

████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████

The Panel thus finds that Milton violated his fiduciary duties of loyalty and good faith to Nikola through his pattern of false and misleading public statements about the Company ████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████.[11] ████████████████████████████████

███████████████████████████████████████

─────────────────────

[11] ████████████████████████████████████████████████████████
████████ ██████████████████████████████████████████████████
██████████████████████████ ███████ █████████████████████████

## II.    The Application of the Indemnification Agreement

Having concluded that Milton breached his fiduciary duty to Nikola and no defense applies, we turn to the application of the ███████████████████████ ██████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████████ ████████████████████

### A.    Milton's Claim ███████████████████ for Indemnification

---

██████████████████████████████████████████████████████████████
████████████████████████████████████████████ ████████ ███████
████ █████ ██████████████████████████████████████████████ █
██████████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████████
███ ████████████████████████████████████████████████████████
██████████████████████████████████████████████████████ █
████████████████████████████ ████████████████████████████████
██████ █████████████████ ████████ ████████████████████████████
██████████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████████
██████████████████████████████████████ ███████ ██████████████
██████████████████████████████████████████████████████████████
████████████████ █████████ ███████████████████████████████████
██████████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████████
██████████████ ██████ ████████████████████████████ we find that Nikola is not required to establish reliance.

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

████████████

As we have already made clear in deciding Nikola's claim against Milton for breach of fiduciary duty, on the record before us, we could not conclude he acted in "good faith" and in a manner that he **reasonably** believed to be in or not opposed to the best interests of Nikola. Accordingly, there is no basis for Milton to receive indemnification.[12]

B.   Milton's Claim ████████████████ for Nikola "to Contribute" Based on Relative Fault

It bears emphasis, however, that our decision that Milton is not entitled to indemnification does not end the contractual inquiry. On its face, ████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

---

[12] ███████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
██████████████████████████████



Under Delaware law, this Contribution provision is enforceable.  In rejecting a challenge to an agreement providing contribution among the parties, one court termed it "an inviolate principle" of Delaware law that "when parties to a contract have expressly allocated indemnification obligations, a court may not imply a different arrangement than the one expressed in the parties' written agreement." *Chaimison v. HealthTrust Inc.-Hosp. Corp.*, 735 A2d 912 (Del. Ch. 1999); *see Freeman v. Carter*, C.A. No. N21C-09-081 EMD at n. 68 (Del Super. Ct. Nov. 15, 2022) ("Delaware will enforce indemnification, when the intention to indemnify

appears in the terms of the agreement,"); *see also Hermelin v. K-V Pharma Co*., 54 A.3d 1093, 1094 (Del. Ch. 2012) ("When a corporation has established by contract the indemnification of a corporate official, the agreement controls unless it conflicts with a mandatory statutory provision.")

In deciding that Milton is contractually entitled to contribution from Nikola based on relative fault, we first address the applicable law to Nikola's contribution obligation concerning the SEC fine.  We find that federal law applies to that issue. We then turn to whether Delaware law precludes contribution for intentional acts or breaches of fiduciary duty.  We hold it does not.

**-- Federal law applies to Nikola's contribution obligation concerning the SEC fine and does not preclude contribution.**

Before addressing ███████████████ that Delaware law precludes contribution for breaches of fiduciary, we must address the threshold issue whether Delaware law applies to the Company's contractual obligation ████████████████████ ████████████████████████████ in connection with its claim to recover the entire $125 million fine it paid to settle the SEC claim.

It is indisputable that the SEC investigation—and the Consent Order resolving the SEC's threatened claims against Nikola—were based exclusively on violations of federal securities laws.  On its face, the Consent Order provides that the SEC "deems it appropriate and in the public interest that public cease-and-desist proceedings be, and hereby are, instituted pursuant to Section 8A of the Securities

61

Act of 1933 ('Securities Act') and Section 21C of the Securities Exchange Act of 1934 ('Exchange Act') against Nikola Corporation ('Nikola' or 'Respondent')." ▮



▮▮▮▮▮▮▮▮▮▮▮▮▮▮ it does not follow that Delaware state law governs where, as here, contribution is sought for liability emanating from claims under federal securities law. "Whether contribution is available in connection with a federal statutory scheme is a question governed solely by federal law." *Lehman Bros. v. Wu*, 294 F. Supp 2d 504, 505 n.1 (S.D.N.Y. 2003). Indeed, Milton could not use Delaware "common law as an end-around to make a claim for contribution that it could not make under the federal statutory scheme." *KBL Corp. v Amouts*, 646 F. Supp 2d 335, 341 (S.D.N.Y. 2009). "[W]here the liability that is the basis for the contribution claim is entirely a creature of federal statute, [Milton] must rely on federal, not state, contribution law." *Picard v. JP Morgan Chase & Co*., 460 BR 84, 99 (S.D.N.Y. 2011).

Indeed, the Second Circuit has made it abundantly clear that the analysis looks to whether the payments that Nikola seeks to recover from Milton, and for which

Milton is seeking contribution, "are required by state or federal law—an easy question." *In re Madoff Investment Securities, LLC v. JPMorgan Chase & Co. et al.*, 721 F.3d 54, 65 (2d Cir 2013). Here, Nikola was required to pay the $125 million fine at issue to settle alleged federal securities violations, and the fine was embodied in the federal "cease and desist proceedings" pursuant to the Securities Act and Exchange Act. As a result, Milton's contribution claim is governed by federal law, not Delaware law.

Cases in which a party has sought contribution concerning a fine paid to the SEC appear to be exceedingly rare. One notable case, ████████████████████ ████████████████████████████████████████████████████, is *Stanley v. Skowron*, 958 F. Supp 2d 417 (S.D.N.Y. 2013). In *Skowron,* Morgan Stanley sought to recover as damages a fine it paid to the SEC, as Nikola does here. Although the claims asserted were for fraud and breach of contract under state law, the court held the claim for contribution was governed by federal law, relying on *Picard v. JP Morgan Chase & Co*. The court held—in language equally applicable here—that "Morgan Stanley's contribution claim is a federal claim since it is based entirely on the securities laws." *Skowron*, 958 F. Supp. 2d at 423 n.59. Rejecting Morgan Stanley's contention that "it sufficiently alleges a right to contribution under state law because Skowron's improper and criminal conduct gives rights to several state causes of action," the court held: "The relevant inquiry, however, is not whether

Skowron's conduct gives rise to state law claims, the question is whether Morgan Stanley's contribution claim is based solely on violations of the federal law." *Id*.

In this case, Nikola's obligation to pay a fine of $125 million is based exclusively on federal securities law violations, and Milton's contractual right to contribution is valid and enforceable unless it contravenes federal law. It does not. Under federal law, a right to contribution is valid and enforceable. As the Delaware Chancery Court observed in holding common law contribution was available in cases involving breaches of fiduciary duty and deliberate acts of fraud, "[t]he most instructive authorities involve contribution under the federal securities laws . . . A right to contribution among joint tortfeasors who 'knowingly committed' a violation of the Securities Exchange Act was codified by the Private Securities Litigation Reform Act of 1995, which contemplates allocation of liability among jointly and severally liable defendants based on their percentage of responsibility." *In Re Rural/Metro Corp. S'holders Litig*, 102 A.3d 205 (Del. Ch. 2014).

Here, ████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

[redacted].

**-- Delaware law does not preclude "contribution" for intentional acts or breaches of fiduciary duty.**

Having decided that federal law applies to Nikola's contribution obligation [redacted] concerning the SEC fine, we now must address whether Milton's breach of fiduciary duty precludes him from enforcing this obligation.

[redacted][13]

13 [redacted]

██ ████. ████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

██████████████████████████

████████████████████████████████████████████ a policy of Delaware

law that ████████ forecloses any kind of contribution to a defendant that breaches a

fiduciary duty—or at least breaches the duty of loyalty.  If there were such a policy

negating the application of ████████████, it would follow that the same policy would

also override the preclusion in ████████████.

The logical place to look for a Delaware policy against contribution is the

Delaware Uniform Contribution Among Tortfeasors Act, known as DUCATA.  "The

right of contribution has been codified under Delaware law" in DUCATA.  *Reddy v.*

*PMA Ins. Co*., 20 A.3d 1281, 1284 (2011).  The Delaware Supreme Court has held

that DUCATA applies to common law breaches of fiduciary duty.  *RBC Capital*

*Markets, LLC v. Jervis*, 129 A. 3d 816, 870 n.218 (2015).  ████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████ the absence of any such policy or preclusion in

DUCATA concerning contribution for intentional torts, including breaches of

fiduciary duty and false statements to shareholders made with "scienter."  *See*

Professor D. Demott, Research Handbook on Fiduciary Law, at 34 n.75 (Edgar

67

Publishing) (available on internet) ("DUCATA contains no language barring *intentional* tortfeasors from contribution." (Emphasis added)).

The decision in *In Re Rural/Metro Corp. S'holders Litig*, 102 A.23d 205 (Del. Ch. 2014) provides a comprehensive analysis of Delaware law in determining the applicability of contribution for claims involving breach of fiduciary duty.   In *Rural/Metro*, the court held that the intentional nature of the conduct by certain members of the Board of Directors constituting violations of the duty of loyalty, and by the Company's lead investment banker in aiding and abetting a violation of fiduciary duty by members of the board, did not disqualify them from obtaining contribution or a settlement credit.  To be sure, Nikola's obligation ████████ ███████████ to any judgment or liability is different from the "contribution" contemplated by DUCATA. ████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████

*Rural/Metro* involved claims by the company's shareholders against Rural/Metro's directors and investment bankers.  The shareholders claimed that the directors violated their fiduciary duties to Rural/Metro through their improper conduct in its sale process, as well as by disseminating false and misleading disclosures to shareholders.  The shareholders also claimed that the company's

investment bankers, including RBC, allegedly aided and abetted these fiduciary violations by the directors.  Specifically, the shareholders alleged that RBC aided and abetted these fiduciary violations by using its engagement for Rural/Metro to influence the sale process in favor of selling to a specific buyer to further RBC's lucrative role in financing that buyer.  In essence, RBC was alleged to have committed "fraud on the board."

In initially determining liability of RBC for aiding and abetting, the Court was not required to categorize the type of breach of fiduciary duty by the director defendants.  "[T]he Liability Opinion only needed to determine that the directors' conduct fell outside the range of reasonableness.  The plaintiffs did not ask the court to go further and categorize the defendant directors' breaches as either breaches of the duty of loyalty or the duty of care.  Nor did the plaintiffs address or attempt to overcome the defendant directors' potential entitlement to exculpation under Section 102(b)(7)."  *Id.* at 220.  In its second decision, the court addressed RBC's argument that it was entitled to contribution and "that it should not bear 100% of the liability of the damages award."  *Id.* at 222.  Unlike this case, RBC did not have a specific contractual right to contribution that was negotiated after the public disclosure of allegations of wrongdoing, as Milton does here.  Instead, its position was based on the common law right of contribution under DUCATA.

In opposing RBC's claim for contribution, it was argued in *Rural/Metro*, ███

██████████████, that "because RBC committed an intentional tort, RBC could

not have obtained contribution from the Settling defendants as a matter of law." *Id.*

at 226-27.  According to the court at the time of the *Rural/Metro* decision, "The

Delaware Supreme Court has not ruled whether DUCATA bars contribution for an

intentional tort.  Pending high court guidance, this opinion concludes that DUCATA

does not establish a bright-line rule barring contribution from other joint tortfeasors,

so RBC is not barred from claiming DUCATA's settlement credit." *Id.*

In reaching its conclusion that contribution was not precluded, the court

engaged in extensive analysis of cases in Delaware and other jurisdictions and stated:

"The most instructive authorities involve contribution under the federal securities

laws. . . A right to contribution among joint tortfeasors who '***knowingly committed***'

a violation of the Securities Exchange Act was codified by the Private Securities

Litigation Reform Act of 1995, which contemplates allocation of liability among

jointly and severally liable defendants based on their percentage of responsibility."

*Id.* at 236.  In language equally applicable to Milton's ability to enforce his right to

contribution under Paragraph 9 of the Indemnification Agreement, the Court stated,

"***The fact that these defendants engaged in knowing or intentional acts does not***

***operate as a bright line bar to contribution***.  Similar principals should apply to

RBC, who engaged in conduct comparable in culpability to a violation of the federal securities laws."[14]  *Id.*

Because the claim in *Rural/Metro* was a common law contribution claim governed by DUCATA, not a contractual agreement such as the one requiring Nikola "to contribute" based on relative fault, the court made a threshold determination whether any of the director defendants were exculpated by a provision in Metro/Rural's certificate of incorporation and thus excluded from the contribution determination.[15]  In doing so, the court reviewed the facts in the record as to each of the directors to determine if they had violated the duty of loyalty and therefore were precluded from exculpation.  The court concluded that two of the six directors had

---

[14]  In assessing RBC's conduct, it is worth noting that the court invoked the equitable doctrine of unclean hands to preclude the advisor from obtaining contribution for certain claims.  The court made clear that in this context, unclean hands is not based on actions toward shareholders but rather toward the contributing party: "[W]hen considering whether the unclean hands doctrine limits RBC's ability to claim the settlement credit, the relevant focus should be on RBC's conduct vis-à-vis the other alleged joint tortfeasors, not RBC's conduct toward the Class."  *Rural/Metro*, 102 A.3d at 237.  In reaching this conclusion, the court reasoned that "[t]he availability of contribution for violations of the securities laws is consistent with focusing conduct among the defendants when applying the defense of unclean hands."  *Id.* at 238.  ████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ In any event, that doctrine is beside the point, given the nature of the contractual mandate ██ ████████████████████████████████████████████████████  Indeed, the application of the equitable defense of unclean hands seems superfluous where an allocation of relative fault at zero percent could be made.

[15]  The next section addresses in detail Delaware law governing exculpatory provisions and the exception for breaches of the duty of loyalty, *see* 8 Del. C. § 102(b), as well as ████████████ ████████████████████████████████████████████████

breached their duty of loyalty and were not exculpated from contribution as joint

tortfeasors and, therefore, counted for contribution.  The court then determined that

the contribution among the three defendants should be apportioned by "relative

fault"—not *pro rata*, as RBC contended.  It bears emphasis that the court determined

each of the directors breached their duty of loyalty by acting in their personal

interests, rather than the best interests of the Company, and RBC's conduct was

found to be even more objectionable.  *Rural/Metro*'s analysis thus negates ███████

██████ that a breach of fiduciary duty precludes contribution.

███████████████████████████████   ████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

█████████████████, █████████████████████████████

████████████████████████████████████████████

██████████████████  █████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

█████████  ██████████████████████████████████

████████████████████████████████████████████

███████████████████████

Paragraph 20 of the Separation Agreement provides further support. From the Separation Agreement's execution on September 20, 2020 through the filing of this Arbitration in 2021, Nikola was controlled by virtually all the same officers and directors whose conduct is placed at issue by ██████████████████

██████████    ███████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

██████████████████████████████

In short, whatever limitation DUCATA may impose on a party seeking to avail itself of the right to contribution, it does not preclude contribution for breaches of fiduciary duties in this case.

**-- Section 102(b)(7) does not foreclose Milton's contractual entitlement to contribution.**

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

████████████████████████    Section 102(b) provides that a company may include in its certificate of incorporation "[a] provision eliminating or limiting the personal liability of a director or officer to the corporation or its stockholders for monetary damages for breach of fiduciary duty as a director or officer."  Here, ███████████████ ████████████████████████████████████ that "such provision shall not eliminate the or limit the liability of . . . [a] director or officer for any breach of the director's or officer's duty of loyalty to the corporation or its stockholders."  *Id.* § 102(b)(7).  This provision does not help Nikola.

On its face, Section 102(b)(7) unambiguously applies only to provisions in a corporation's certificate of incorporation "eliminating or limiting the personal liability" of directors and officers—also called exculpatory provisions—and it creates an exclusion for breaches of the duty of loyalty applicable only to such a provision.  On its face, there is nothing "exculpatory," which is defined as "to free from blame" (Webster's New World Dictionary, College Edition), about ██.  On the contrary, █████████████████████████████████████████████████████

██████████████████████████████████████████████

████████████.

     There is also nothing in the text of Section 102(b)(7) that would extend the statute to govern, much less invalidate, a provision of an agreement entered into by a company's board of directors—not by shareholders in the corporate certificate— especially where the Company received substantial consideration in exchange. As the Delaware Supreme Court has held, "[t]he rules of statutory construction are well settled. First, we must determine whether the statute is ambiguous. If it is unambiguous, then there is no room for judicial interpretation, and the plain meaning of the statutory language controls." *CML V, LLC v. Bax*, 28 A.3d 1037, 1041 (Del. 2011). Courts construing Section 102(b)(7) have strictly construed its text. *See Gantier v. Stephens*, 965 A.2d 695 (Del. 2009) ("Under 8 Del. Section 102(b)(7), a corporation may adopt a provision in its certificate of incorporation exculpating its directors from monetary liability for an adjudicated breach of their duty of care. Although legislatively possible, there is currently no statutory provision authorizing comparable exculpation of officers."[16]); *In re Rural/Metro Corp.*, 88 A.3d 54 (Del. Ch.) (refusing to extend Section 102(b)(7) to aiders and abettors and holding that "[w]hen the plain language of a statute produces a rational result, a court's task is to apply the statute as written.")

---

[16] The statute was subsequently amended to include officers.

Indeed, where the Delaware legislature has intended to regulate corporate actions involving fiduciary duties—both through a provision in the certificate of incorporation and through actions by the board of directors—it has explicitly done so through statute.   In 2000, "Delaware dramatically departed from tradition, amending its statutes to enable corporations to waive a critical component of loyalty—the corporate opportunity doctrine—which forbids corporate fiduciaries from appropriating new business prospects for themselves without first offering them to the company."  G. Rauterberg & E. Tilley, "Contracting out of the Fiduciary Duty of Loyalty: An Empirical Analysis of Corporate Opportunity Waivers", 117 Columbia Law Rev. 1075, 1077 (2017).  This provision is contained in 8 Del C. § 122(17), which provides specific corporate powers.  Section 122(17) states:

> Every corporation created under this chapter shall have the power to:
>
> . . . Renounce, in its certificate of incorporation or ***by action of its board of directors***, any interest or expectancy of the corporation in, or in being offered an opportunity to participate in, specified business opportunities or specified classes of business opportunities that are presented to the corporation or 1 or more of its officers, directors or stockholders.

(Emphasis added.)

In sharp contrast, Section 102(b)(7) conspicuously omits this allowance for "action by [a company's] board of directors" and is limited to provisions by shareholders in a company's certificate of incorporation.  Accordingly, neither the power under Section 102(b) nor the limitation on the power under Section 102(b)(7)

creates any general policy invalidating Nikola's obligation to contribute pursuant to Paragraph 9.



### III.    Analysis of the Various Claimed Damages

Having decided that Milton breached his fiduciary duties to Nikola and that Milton is entitled to contribution from Nikola based on relative fault principles, we now turn to the question of what damages Nikola can recover, and to what extent Nikola must contribute.  First, we address Nikola's request to recover ████████ ██████████████████████████████████.  Second, we consider Nikola's attempt to recover the $125 million fine paid by the Company to the SEC.  Finally, we address the recovery Nikola seeks for legal fees and related professional fees for services rendered to Nikola and its employees.

### A.    ████████

Nikola first seeks to recover as damages in this Arbitration ████████████

████████████████████    ████████████████████████    ████████████

████████████████████████████████████████████████████

████████    In the Criminal Action, Milton was convicted by a jury of three of counts of securities fraud and wire fraud and acquitted on one count of securities fraud. Milton filed a post-trial motion seeking a new trial on the three counts for which he was convicted, which was denied by the district judge on August 30, 2023.

As a threshold legal matter, it is well-established that advanced legal fees cannot be recovered and are not ripe for adjudication unless and until a final unappealable judgment has been rendered in the underlying action. *Sun-Times Media Group, Inc. v. Black*, 954 A.2d 380 (Del. Ch. 2008). In *Sun Times*, the court rejected a similar attempt to prematurely adjudicate Black's entitlement to advanced fees. Sun-Times argued that "the final disposition of a criminal proceeding occurs at the time of sentencing at the trial court level." (*Id.* at 383). In language equally applicable here, the court stated: "The system of advancement and contribution that would result from Sun-Times' interpretation of final disposition as the final judgment at the trial court level would be odd, complex, inefficient and capricious." *Id*. at 402. *Accord, Paulino v. Mace Security International, Inc*., 985 A.2d 392, 397 (De. Ch. 2009) (Laster, V.C.) (*sua sponte* staying an indemnification claim, noting "Indemnification and advancement are 'legally quite distinct.' It is generally

premature to consider indemnification prior to the final disposition of the underlying action." (internal citation omitted)).

Following *Sun Times*, the Delaware Supreme Court removed any doubt concerning the prematurity of Nikola's attempt to recover the legal fees it advanced in the Criminal Action. *See Connelly v. State Farm Mut. Auto Ins. Co.*, 135 A.3d 1271 (Del. 2016). The Supreme Court held that "[a] cause of action for indemnification accrues when the officer or director can be confident any claim against him has been resolved with certainty. Putting it another way, this Court made clear that until the final judgment of the trial court withstands appellate review, the outcome of the underlying matter is not certain." (*Id.* at 1280).

Here, adjudicating Nikola's alleged damages for ███████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████

███████████████ Accordingly, the issue is not ripe for adjudication; Nikola's claim would necessitate a decision before the "final judgment of the trial court withstands appellate review, [and] the outcome of the underlying matter is not certain." *Id.*

Indeed, ███████████████████████████████████

███████████████████████████████████████████████

███████████████ ███████████ ████████████████████████

███████████████████████████████████████████████

Along the same lines, ███████████████████████████████



It is undisputed that the underlying Criminal Case has not become final ████ ████████████████████████████████████████████ Although the trial court has denied Milton's post-trial motion to set aside the portion of the jury verdict convicting him, the appeal has not yet been briefed or argued, much less decided.  Accordingly, the Panel will not award Nikola ██████████████████████ █████ ██████████ in this Arbitration.

81

Our decision is reinforced by █████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

████████████████████ ████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

██████████████████████████████████████████

Subsequently, ███████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████

From our review of ████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████ For this reason, Nikola's request to recover ██████████████

████████ is denied without prejudice to adjudication of the issue ██████████████

████████ ████████████████████████████████████████.

**B.      The SEC Fine**

We next address Nikola's claim to recover the SEC fine from Milton.

**-- Nikola is not precluded from any recovery of the settlement it voluntarily made with the SEC.**

As a threshold legal matter, Milton argues that Nikola is foreclosed from recovering any of the SEC fine because the Company negotiated the settlement ████████████████████████████████████████ and the settlement does not release Milton

from liability in the SEC's separate case against him.  On this issue, Milton and Nikola debate the application of *Paron Capital Management, LLC v. Crombie*, 2012 W.L. 2045857 (Del. Ch. May 22, 2012), *aff'd without opinion*, 62 A.3d 1223 (Del. 2013).

But *Paron* has no similarity to this case.  It did not involve an SEC fine and Defendant Crombie, whose business was a scam that relied on forged accounts, appeared *pro se*.  The plaintiffs, who were not acquainted with Crombie, had been fully duped into investing in Crombie's business, despite conducting thorough due diligence and even hiring a risk consulting firm to investigate before investing. Insofar as the Court denied recovery for any of "the settlement of potential claims" arising from the fraud, it did so "without prejudice," as the claims were "neither ripe nor adequately supported by the evidence in the record."  *Id.* at *12.  In short, *Paron* has no bearing on whether Nikola is entitled to recover some or all of the SEC fine from Milton.[17]

---

[17] Similarly unilluminating is *Lagrone v American Mortell Corp*., 2008 WL 4152667 (Del. Super. Ct. Sept. 4, 2008), which also did not involve a claim to recover an SEC fine. Rather, *Lagrone* involved a claim for indemnification based on underlying litigation where Marmon, the party seeking indemnification, settled mid-trial, before the jury could determine negligence. The Court dismissed the negligence action but vacated the order at Marmon's request, so that it could adjudicate Marmon's indemnification claim. However, instead "[p]laintiffs filed a separate action for indemnification rather than simply prosecuting their cross claims in the reopened *Lagrone* case."  *Id.* at *2.  On the particular facts of the case before it, the court dismissed the indemnification complaint, holding "implied indemnification is not available here because [p]laintiffs cannot well-plead that Marmon's settlement of the Lagrone action did not resolve the claims of direct (active) negligence against it (as opposed to claims that Marmon was liable solely for the negligence of others)."  *Id.* at * 1.  The decision in *Lagrone* was plainly rendered on the particular facts and procedural context of that case ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

A decision that is instructive here is *Stanley v. Skowron,* 958 F. Supp 2d 417 (S.D.N.Y. 2013).  In that case, defendant Skowron was a former doctor working in finance, who joined the hedge fund FrontPoint, owned by Morgan Stanley, where he co-managed healthcare funds.  Skowron met a French doctor involved in clinical trials of a drug owned by HGSI, and FrontPoint made purchases totaling approximately $65 million in HGSI stock.  Subsequently, the French doctor gave Skowron inside information in advance of a press release disclosing extremely negative information about the status of the drug's clinical trial, which caused the shares to lose half their value.  As a result, Skowron sold all of FrontPoint's HGSI stock before the press release was issued, avoiding a loss of approximately $30 million.  The SEC opened an investigation, and Skowron asked the French doctor to deny providing him any inside information.  Skowron lied to the SEC, federal prosecutors, and Morgan Stanley for two years.

The SEC filed a civil action against the French doctor and eventually named Skowron as a defendant, alleging he violated several securities laws, including Rule 10-5.  The SEC did not allege any securities violations by Morgan Stanley or FrontPoint.  Morgan Stanley and FrontPoint settled with the SEC as to the claims against Skowron and paid the SEC $29,017,156, representing the "profits gained

and/or the losses avoided as a result of the conduct alleged in the SEC Action."
Morgan Stanley sued Skowron for a variety of claims, including for breach of
fiduciary duty, seeking damages including the amount of the SEC settlement, as well
as "disgorgement" of insider trading profits (actual losses avoided) and damages for
attorneys' fees and costs related to the investigations by the US Attorney's Office,
the SEC, and Morgan Stanley itself.  Morgan Stanley also alleged a claim for
contribution.  Skowron moved to dismiss the Complaint.

Although the Court dismissed the breach of fiduciary duty claim in part, it did
not do so on the basis that Morgan Stanley was not entitled to recover damages from
Skowron for funds voluntarily paid to settle the SEC action, which alleged
misconduct by Skowron.  Rather, the court dismissed a portion of the breach of duty
claim based entirely on the specific nature of the disgorgement damages plaintiff
was seeking to recover, which neither Morgan Stanley nor FrontPoint was entitled
to receive.  As the Court stated: "That the losses were avoided because of Skowron's
insider trading and not Morgan Stanley's wrongdoing does not alter the conclusion
that the Settlement Amount represented money which Morgan Stanley and
FrontPoint were never entitled to retain."  *Id*. at 427.

Significantly, the Court denied the motion to dismiss the remaining fiduciary
duty claim, holding: "Morgan Stanley seeks other damages for breach of fiduciary
duty, including, for example, attorneys' fees and costs related to investigations by

the United States Attorney's Office, the SEC and Mogan Stanley itself.  Accordingly, the breach of fiduciary duty claim is not dismissed in its entirety."  *Id.* at n.98.

Although we recognize that *Stanley* differs from this case in that the SEC settlement in *Stanley*, unlike the one here, released Skowron from liability, we believe that difference should not affect Nikola's right to recover from Milton an amount reflecting the fair share of the SEC fine for damages caused by his conduct. Indeed, this conclusion is consistent with our finding that Milton's false and misleading statements, which the SEC imputed to Nikola by virtue of Milton's position in the Consent Order, violated his fiduciary duty of loyalty and good faith to Nikola.  As a result, Nikola is entitled to recover from Milton his fair share of the damage Nikola had to pay in settlement of the SEC claims against it—regardless of whether the settlement released Milton from SEC liability.

**-- Nikola is entitled to recover some but not all of the SEC fine.**

Having determined Nikola is not precluded from recovering the SEC fine, we turn to determining if Nikola is entitled to recover some or all of the fine.  Our starting point requires an analysis of the SEC claims on which the $125 Million fine is predicated to determine the nature of the claims alleged by the SEC and who they were alleged against.  The Consent Order alleges that "Nikola . . . made numerous material misrepresentations to investors about key aspects of its business.  From at

87

least March 2020 through September 2020, Nikola deceived investors about its products, technical advancements, and commercial prospects." (*Id*. at ¶ 1.)

It bears emphasis, however, that Nikola can only act through its officers and directors, and Milton's actions played a prominent role in certain of the claims alleged by the SEC. Indeed, in the Consent Order the SEC alleged that "Nikola violated Section 10(b) of the Exchange Act and 13a-15(a) thereunder and Section 17(a) of the Securities Act," (*Id*. at ¶ 4) and "Nikola primarily misled investors through scores of misrepresentations ***by its CEO and later Executive Chairman Trevor R. Milton***." (*Id*. at ¶ 2.) In this same vein, the Consent Order identifies a single individual as the "Relevant Person:" Milton. (*Id*. at ¶ 6; emphasis added.).

On its face, the SEC Consent Order is based on three separate and independent categories of violations of the securities laws and SEC Rules and Regulations, and all are asserted against Nikola—the only Respondent named in the Consent Order. (*See* ████) Our analysis focuses on one of these categories: Nikola's "Material Misrepresentations to Investors through Milton" (*id.* at ¶¶ 20-34), as the SEC has stated these were the "primary" claims alleged.

The material misrepresentation to investors through Milton impute to Nikola false or misleading statements made by Milton in his capacity as the highest-ranking officer of Nikola. Specifically, the Consent Order states, "From approximately March 2020 through September 2020, in his capacity as CEO and later as Executive

Chairman of Nikola, Milton made materially false and misleading statements on numerous critical topics related to Nikola's capabilities, technology, reservations, products and commercial prospects."  (*Id*. at ¶ 20.)

█████████████████████████████████████████████

█████████████████████████████████████████████

█████████████████████████████████████████████

█████████████████████████████████████████████

████████   More specifically, the SEC asserted, "Milton posted, or directed the posting of" the 2018 video clip showing the Nikola One moving on a road, which was embedded in a tweet reading: "Behold, the Nikola One in motion.  Pre-production units to hit fleets in 2019 for testing.  The Nikola Hydrogen Electric Trucks will take on any semi-truck and outperform them in every category: weight, acceleration, stopping, safety and features—all with 500-1,000 mile range!"  Indeed, the SEC Consent Order specifically alleges that the "in motion" video remained posted on Nikola's corporate Twitter, Facebook, and YouTube accounts, as well as on its website, and was available for viewing by investors and prospective investors until at least September 2020."  (*Id*).  According to the SEC:

> The video and the caption…were misleading because the video showed the Nikola One moving down road with text that told the viewers to "behold" the Nikola One "in motion', while omitting the fact the truck was rolling down an incline due to gravity rather than under its own power.  The 'In Motion' video thus left viewers with the false and

misleading impression that the Nikola One was capable of moving under its own power.

(*Id.* at ¶ 22.)

████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████

█████████████████████████████████; *see In Re Rural/Metro Corp. S'holders Litig*, 102 A.3d at 259 (finding breach of duty of loyalty where a director gave "his support for a near-term sale stemm[ing] in large part from his desire to go along with" other directors.)

████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████████████████ In short, Milton disseminated the false and misleading "In Motion" video in 2018, and he bears the full responsibility for its imputation to Nikola, █████████████████████████████████████████

██████████████████████████████

Subsequently, on June 17, 2020—two weeks after Nikola had become a public company—Bloomberg reported that Milton had overstated the capability of the Nikola One at its debut in 2016. ███████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

███████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

██████████████████████████████████

We reach the same conclusion as to the other claims in the Consent Order imputing to Nikola Milton's false and misleading statements (1) about Nikola's then-current hydrogen production capabilities, the cost of production of hydrogen, and its cost of electricity to produce hydrogen (██████ at ¶ 23); (2) that Nikola engineered and completed a prototype of the Badger electric pickup truck and that it used Nikola's proprietary components; (3) that Nikola had truck "contracts,"

including that Nikola's pre-orders were "not letters of intents, they're actual contracts. . . . Yeah billions and billions of dollars with contracts." *(Id.* at ¶ ¶ 29 & 30); (4) about a "breakthrough" in battery technology *(Id.* at ¶ 31); (5) about Nikola's in-house component development and manufacturing capabilities *(Id.* at ¶ 32); and (6) that the total cost of Nikola's trucks was 20 to 30% below that of diesel vehicles *(Id.* at ¶ 33).

The Panel concludes that ████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████ Accordingly, all the false and misleading statements by Milton that were legally attributed to Nikola by the SEC in the Consent Order, which the SEC stated were the "primary" claims alleged, are damages Nikola suffered due to Milton's conduct and the primary responsibility of Milton.

We ascribe some responsibility to Nikola, however, based on ████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
███████████████████. ████████████████████████████████████████

92

███████████████████████████████████████████████████

████████ *Contra* Dissent at 6.  On the contrary, we take those actions and inactions into account.  We simply weigh the evidence differently than our Panel colleague.

On this record, we ascribe 97% of the fine to settle these "primary claims" in the Consent Order to Milton and find Milton liable for this amount.  Of this amount, 97% of the amount Nikola has already paid to the SEC is due now, and the remaining amount will become due as Nikola pays additional amounts of the fine to the SEC.

### C.    Legal Fees & Related Processional Services Fees

Having addressed Nikola's request to recover the ████ fees and SEC fine, we turn now to Nikola's remaining alleged damages for legal fees and professional services.  First, we address Nikola's request to recover legal fees paid to ████.[18] Next, we address Nikola's claim for professional fees and expenses related to ████. Finally, we turn to the remaining recovery Nikola seeks for legal expenses incurred by firms ████████████████████████████████.[19]

---

[18] We also address Nikola's request to recover legal fees paid to ████████ and ████████ in connection with ████████████████.

[19] In deciding Milton's false and misleading statements caused Nikola to incur these legal and profession services fees, the Panel has relied primarily on ████████████████  Although the Panel has reached this decision largely based on ████████████ the Panel has considered ████████████████████████████████████████████████ ████████████████████████.

-- ███████

Nikola seeks to recover as damages all of the legal fees it paid to ████, which total $32.102 million and were incurred in connection with ████████████████ ██████████████: (1) ████████████████████ ($23.805 million); (2) ████████████████████████████ ($5.037 million);  (3) ████████████████ ████████████████████████████ ($980,000); and (4) ████████████████████ ($260,000). ████████████████ ████ ████████████ ████.

-- ████  **Fees for** ██████████████████

Among the damages Nikola seeks to recover are all legal fees it paid to ████████ in connection with ██████████████████, which amount to $23.805 million.

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████

94

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

██████████████████████████████████████████

The record, including ████'s presentations to the SEC and the Consent Order, thus establishes ████'s representation of Nikola was not strictly limited to representing Nikola in response to Milton's false and misleading statements. Accordingly, Nikola is not entitled to recover all the legal fees paid to ████.  Like we determined in connection with the fine paid to the SEC, there must be an allocation of ████'s legal fees.  The legal fees appear to mirror the Consent Order. The primary representation by ████ ████████████████████████████

███████████████████████████████████████████████████

████████████████████████████████.

As a result, we allocate 97% of ████'s fees to Milton's false and misleading statements that were imputed to Nikola.  These fees are the sole responsibility of Milton.  Although ████'s representation involved ███████████████████████

███████████████████████████████████████████████████

██████████████████████████████████████████████████████████.

Accordingly, Milton cannot escape liability for the ███████ fees.  As to the fees relating

to ████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████.

Along these lines, we must also consider the impact, if any, of the fees paid

by Nikola for ████████████████████████████████████████████

█████████████████████████████████████████  ██████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████  ██████  ██████████████████████████

█████████████████████████████████████████  ██████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████  ████████████████████████████████████  ████████████

████████████████████████████████████.

On the other hand, the Consent Order was filed on December 21, 2021,

concluding the SEC investigation.  However, the record does not support the

conclusion that ███████████████ ████ █████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████ Accordingly, Milton is also 97% responsible for the ████ ███████

███████████████████████████████ rendered after the period ending

December 31, 2021, which are recoverable as damages by Nikola.

**-- ██████ Fees for the Securities Litigation**

Nikola also seeks to recover ██████'s fees for ████████████████████████

███████████████████████████████████████████████████████████████

███████████████████. In addition to the ██████ fees, Nikola also seeks to recover

legal fees paid to ███████████, ██████████████████ ██████ ████████████████████████.

Finally, Nikola seeks to recover an additional $21,000 for legal fees paid ████████████

███████████████████████████████████████████████████████████████

██████████████████████████████████████████

        ███████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

the difference between clawing back fees that are "advanced" pursuant to Section 145(e), which must await "final disposition" of the case before the recipient can be

forced to repay the funds advanced, and Nikola's claim to recover legal fees it was forced to pay for its own representation as "damages" caused by Milton's actions. Indeed, the precise interpretive issue addressed in *Sun-Times Media*, ██████████ ████████████████████████████████, was determining the duration of "advancement" under Section 145(e), based on the meaning of the term "final disposition."  As the court phrased the question before it, "What is the purpose of using the words final disposition in Section 145(e) and advancement by-laws?" (*Id*. at 393.)  Accordingly, *Sun-Times Media* and the Panel's conclusion that a lack of finality presently precludes Nikola from recovering legal fees ██████████████ ██████████████ do not support ██████████████ that Nikola cannot seek damages for legal fees it claims were caused by Milton's false and misleading statements.

██████████████ we ██████████████████████████ reviewed not only the 2023 case ██████████████, *Schwartz v. Cognizant Tech Sols Corp.* 2023 Del Ch. Lexus 13 at 4, 5 n.17-18, 6), but also each of the collected cases in *Schwartz*.  Each of those cases addressed an attempt to obtain a return of legal fees that had been advanced, and none of them extended the finality rule to foreclose a damages claim against an indemnitee ██████████████.

██████████████████████████████

██████████████████████████████

In reaching our determination, we cannot accept the position that Milton's falsehoods did not cause the Hindenburg Report.  Any doubt that Milton's falsehoods caused the Hindenburg Report is demolished by the first bullet in the Hindenburg Report itself, which states, "Today we reveal why we believe Nikola is an intricate fraud built on dozens of lies over the course of its Founder and Executive Chairman Trevor Milton's career." (████ at 1).  The second bullet reinforces the point: "We have gathered extensive evidence—including recorded phone calls, text messages, private emails and behind-the-scenes photographs—detailing dozens of false statements by Nikola Founder Trevor Milton.  We have never seen this level of deception at a public company especially of this size." (*Id.*) ████████

████████████████████████████████

████████████████████████████████

████

For the foregoing reasons, we conclude that Nikola is entitled to recover most of the legal fees (apportioned 97% to 3%, as explained elsewhere) it expended on ████████████████  ████████████████

██████████████████████████████.  In reaching this conclusion, we do so without prejudice to any future potential action or proceeding by Milton to seek the return, through indemnification, insurance, or otherwise, of such payments based on ████████████████

██████.[20]  In this instance, the Panel's decision is confined to the payments sought in this Arbitration and does not address whether Nikola is entitled to any future payments or to seek future payments.

## -- ███ **Fees for** ████████████████████

Nikola additionally seeks to recover ███'s legal fees in providing ██████ ████████████████████ ████████ ██████████ ████████████. Like ██████████████, the ██████████████ are result of the harm to Nikola caused by the Hindenburg Report.  And for the reasons explained above, we find that Milton's falsehoods caused the Hindenburg report.  As a result, Nikola is entitled to recover most of the legal fees (apportioned 97% to 3% as explained above) paid to ████ for providing ██████████████████ ████████████████.

## -- ███ **Fees for the** ██████████████

The final category of ███ legal fees that Nikola seeks are ██████████████ ████████████████████████████ ████████████████████████████ ████████████████████████████

---

[20]  We note that ████████████████████████████ ████████████████████████████████████ ████████████ █ ████████████████████████████ ██████████████████

103

█████████████████ we conclude that Nikola can recover a portion (specifically 97%, for the reasons explained above) of its fees incurred in the ████████████████

### -- Professional Fees and Expenses Related to █████

In addition to █████'s legal fees, Nikola also seeks to recover fees it expended on various professionals who worked with or assisted █████.   We address each request below.

### -- ████████████████

████████████ is a consultant retained to assist █████  ████████████████████ ████████████████████████████████████ ████████████████████████████████████. ████████████████████████████████████████'s ████████████████████████████████████ ████████████████████████████████████ ████████████████████████████. Accordingly, we conclude that the $728,000 in fees paid to ███████████ should reflect the same overall allocation as ████'s fees in connection with ████████████████, which is 97% allocable to, and recoverable from, Milton.  Therefore, Nikola is entitled to recover $706,160.

### -- ████████████

As █████████████████████ ████████████████████████████ ████████████████████████████████████████████

██████████████████████████ ████ █████████████████████ We conclude that ██████'s work was primarily necessary due to Milton's actions, and that the $96,000 in fees paid to ██████ should reflect the same 97% fault allocation to Milton utilized for ██████'s fees relating to the additional misstatements by Nikola ██████████████ ██████████████████ Therefore, Nikola is entitled to recover $93,120.

-- ██████████████

The ██████████████, ██████████████████ was retained to provide support to ██████ and ██████████ in ████████████████████ and was paid $564,000, which Nikola seeks to recover. ████████████████████████████████

█████████████████████████████████████████████████████

████████████████████████████████████ Accordingly, the 97% to 3% allocation of fees paid by Nikola to the ██████████████ are governed by the Panel's ruling on the fees of ██████ and ██████████ and are recoverable subject to the same ruling.

-- ██████████████

██████████████ is ████████████████████████████████████████████████████, which was retained by Nikola ████████████████████████████████ ████████████████████████████████████████ Nikola paid ██████████████ $1,304,000, which it seeks to recover from Milton. ████████████████████████

105

███████████████████████████████████████████████████

████████████████████████████████████

██████████████████████████████████████████████████ *NACCO*

*Industries, Inc. v. Applica Inc*., 997 A.2d 1,32 (Del. Ch. 2009), stating that "the harm

flowing from an event in the but for sense at some point becomes too attenuated to

give rise to liability."  In making this observation, the court was explicitly referring

to the limitation that a "false statement must be a legal cause of the harm, meaning

that the false statement must be a sufficiently significant cause of the harm to impose

liability."  (*Id*.)  *See Smash Franchise Partners, LLC v. Kanda Holdings, Inc., et al,.*

C.A. No. 2020-0302-JTL (Del. Ch. Decided: July 14, 2023) (Laster, V.C.) (applying

legal cause test).  ██████████████████████████████████████████

██████████████████████████████████████████████████

█████████████████████████████████████████████

█████████████████████████████████████████ As we

have already discussed, on its face, the Hindenburg Report was aimed directly at

falsehoods disseminated by Milton and asserted that Nikola was a sham company.

(██████ at 1.)  ("Today we reveal why we believe Nikola is an intricate fraud built on

dozens of lies over the course of its Founder and Executive Chairman Trevor

Milton's career.")  In this context, ██████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████. As the court counselled

in *Hampshire Group, Ltd v. Kuttner*, "a duty of loyalty breach loosen[s] the stringent

requirements of causation and damages.  Any uncertainty in awarding damages is

resolved against the wrongdoer."   2010 W.L. 2739995 at 35 (Del. Ch. 2010).

Accordingly, the Panel determines that 97% of the expenses paid to ████████ are

recoverable by Nikola.

-- ██████████████████████

████████ was retained to ██████ ██████████████████████████████

████████████████████. ██████████████████ Nikola seeks to

recover $2,404,000 in fees for ████████ ██████████████████ provided by

████████ would extend to all aspects of █████████████████████████

Accordingly, we apply the same over allocation used for ██████'s legal services to the

████████ fees, which allocates 97% of the responsibility to Milton.

-- ██████████

Similarly, a company called ████████ was also retained to r████████████████

██████████████████████████████████ ████ ████████████████████

████████████ The fees to ████████ amounted to $2,712,000.  As for the ████████

fees, we will apply the allocation as for ████'s fees to the ████ fees, which allocates 97% of the responsibility to Milton.

-- ██████████

██████████ is a company that ████████████████████████████ ███████████████████████████████ ███ ████████ The company was retained to ████ ████ ████████████████ ████████████████████████████, and Nikola seeks to recover $2,404,000 in fees to ██████████ Here too, the fees relating to ██████████ are a microcosm of ████'s fees, and we will apply the same allocation applied to ████'s fees, which allocates 97% of the responsibility to Milton.

-- **Legal Fees for** ████████████████████ ████████

-- ██████████

The ██████████ law firm was retained ████████████████████ ███████████████████████████████████ ██████████████████████ (*See* ████████.) ████████████████ ███████████████████████████████████ ███████████████████████████████████ ████████████████████████████ ████████████████████████████ ███████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

████████████

    ██████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

█████████

        --  ██████████████████████████

Nikola  also  paid  $500,000  to  ██████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████████████ ████████████████████████████

██ ██████████████████████

Using the same reason set forth, we allocate 97% of the responsibility to Milton for these fees.

-- ████████████

The law firm of ████████████ was retained ████████████████████████

████████████████████████████████████████████████████████████

██████████████ ████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████ Accordingly, Nikola's request to recover fees paid to ████████████ granted, using a 97% allocation, under the same reasoning set forth above.

-- ████████████████

Nikola also seeks to recover $670,000 in legal fees it paid ████████████████

to provide ████████████████████████ ████████████████████████

████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

████████        Accordingly, Milton is responsible for 97% of the bills Nikola paid to

████████████████████████████████████

**--  ████████  Firm**

The ████████ firm █████████████████████████████████████████████

█████████████████████████        Nikola seeks to recover $416,000 it paid to the ████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

████████████████ Accordingly, Nikola's claim to recover the fees paid to the

███████ Firm is granted, at 97% of fees requested, for the reasoning set forth above.

## IV.   Nikola's Claim for Disgorgement

Nikola also purports to seek approximately $70 million in so-called

"disgorgement" damages from Milton. █████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

█████████████

████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

██████████

        ████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

Under Arizona procedural law, which applies to this Arbitration, "[d]amages must be disclosed with some specificity long before trial," and this disclosure requires "a description of the substance—not merely the subject matter—of the testimony. . . . Disclosure of damages requires a computation and measure of each category of damages alleged by the disclosing party, the documents and testimony on which such computation and measure are based and the name, address and telephone number of each witness whom the disclosing party expects to call at trial

to testify on damages." *Estate of Brady v. Tempe Life Care Village*, 519 P.3d 707, 712 (Az. Ct of Appeals 2022) (citing Ariz R. Civ. P. 26.1(a)(7))

[redacted]

[redacted] But by the time Milton was able to sell any shares [redacted] in December 2020, all the allegations in the Hindenburg Report had already been public for almost three months. The efficient market was thus well aware that Milton had resigned from Nikola amid a blizzard of allegations that Nikola was a sham company based on "an ocean of lies by Milton" and that the Company was being sued in securities class actions.

[redacted]



████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████.[21]

Finally, this claim also fails because the shares Milton sold belonged to him, and the Company was not harmed by any change in the sale date.  For all these reasons, the Nikola's disgorgement claim is denied.

**V.     Nikola's** ████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████

The collateral source rule is "firmly embedded" in Delaware law and provides that a tortfeasor cannot reduce its damages because of payments or compensation received by the injured person from an independent source.  *Stayton v. Del. Health Corp.*, 117 A.3d 521, 526-27 (Del. 2015).  The rule is "based on the quasi-punitive nature of tort liability law."  *Id.*  Thus, when a plaintiff's losses are less than the "full

---

[21] ████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████  ████████████████████  ████████████████████
███████████████

damages caused by the tortfeasor's wrongdoing" due to receipt of independent payments or compensation, the collateral source rule "operates to allocate the resulting windfall to the plaintiff rather than the defendant." *Id.*

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████ Under the collateral source rule, Milton has "no right to benefit from[] monies received by [Nikola] from sources unconnected with [Milton]." *Stayton*, 117 A.3d at 527. As a result, the collateral source applies and prevents Milton from offsetting damages based on ████████████████.[22]

## VI.   Nikola's Claims for Interest

Having determined that Nikola may recover certain of its requested damages at a 97% allocation rate to Milton, we must turn to Nikola's request for prejudgment interest, present value calculations, and post-judgment interest.

### -- Prejudgment Interest

---

[22] ████████████████████████████████████████████████

████████████████████████████████████████████████ *See also* *Stayton*, 117 A.3d at 527 ("Because the law must sanction one windfall and deny the other, it favors the victim of the wrong rather than the wrongdoer."). ████████████████████████ ████████ ████████████████████ ████████████████ Contribution under DUCATA is a distinct issue given that DUCATA governs contribution among multiple tortfeasors, whereas the collateral source rule is specific to payments from an independent source.

Under Delaware law, "[a] successful plaintiff is entitled to interest on money damages as a matter of right from the date liability accrues." *Valeant Pharms. Int'l v. Jerney*, 921 A.2d 732, 755-56 (Del. Ch. 2007).   The Panel has "broad discretion" in fixing the interest rate, with Delaware's legal rate of interest, *see* 6 Del. C. § 2301, used as "the benchmark." *Valeant*, 921 A.2d at 755-56.  Here, ███████████
███████████████████████████████████████████████████
███████████████████████████████████████████

In the Interim Award, the Panel awarded Nikola prejudgment interest at Delaware's legal rate of interest compounded quarterly from September 10, 2020 to August 4, 2023 and ordered the Parties to meet and confer on the amount of prejudgment interest and submit calculations to the Panel within ten (10) days if agreement was not reached.[23]  In their supplemental briefing, the Parties raised three issues related to the Panel's award of prejudgment interest to Nikola: (1) whether a fixed or variable interest rate should apply; (2) whether Milton owes prejudgment interest on unpaid portions of the SEC fine; and (3) whether Milton owes

---

[23] ███████████████████████████████████████████
███████████████████████████████████████████
███████████████████████████████████████████
███████████████████████████████████████████
███████████████████████████████████████████
███████████████████████████████████████████
████████████████████████

prejudgment interest on interest paid or owed to the SEC on the SEC fine.  We address each issue in turn.

*First*, we find that the prejudgment interest awarded to Nikola should be calculated at a fixed rate.  ████████████████████████████████████ ████████████████████████████████████████ We find that an award of fixed rate interest is appropriate and consistent with Delaware law.  *See Well Thrive Ltd. v. SemiLEDs Corp.*, 2021 WL 1318131, at *2 (D. Del. Apr. 8, 2021) ("The Court declines to use a variable rate, finding that the language of the statute suggests that the rate should be fixed based on when liability for interest begins to run.").  Nikola is entitled to prejudgment interest compounded quarterly from September 10, 2020 to August 4, 2023.  (Interim Award at 2(G)).  Such interest shall be calculated at Delaware's statutory rate of 5% (Del. Code tit. 6 § 2301(a)) plus a Federal Reserve discount rate of 0.25%.  ████████████████████████

*Second*, we find that Nikola is entitled to prejudgment interest allocated to the portion of the SEC fine actually paid—$38,000,000 total, with $36,860,000 (97%) awarded to Nikola in damages.  (Interim Award at 2(B)).  Nikola is not presently entitled to prejudgment interest on future, unpaid portions of the SEC fine.

Prejudgment interest on the outstanding amount of the SEC fine shall become due and payable as Nikola makes additional payments.[24]

***Third***, ██████████████████████████████████████████████████

███████████████████████████████████████████████ Like the above, we find that Nikola is entitled to prejudgment interest only on the interest it has presently paid to the SEC.  Nikola is not entitled to recover prejudgment interest on future interest payments to the SEC.

### -- Present Value

███████████████████████████████ the Panel finds that Nikola is not entitled to recover the present value of its damages calculated as of September 10, 2020.

███████████████████████████████████████████████████

███████████████████████████████████████████████████

████████████

### -- Post-judgment Interest

Finally, in the Interim award, the Panel awarded Nikola post-judgment interest on the Award (including prejudgment interest) at Delaware's legal rate, compounded quarterly as of the date of this Decision and Award.  ██████████████████

███████████████████████████████████████████████████

---

[24]  To the extent Nikola reads the Interim Award to the contrary, any such ambiguity is hereby resolved, and this Decision and Final Award controls.  ██ ██████████████

███████████████████████████████████████████

███████████████████████████████████████████

██████████████████████████

As a result, the Panel hereby finds that Nikola is not entitled to post-judgment interest in this Arbitration and should instead seek such interest from a court upon moving to confirm and enter the Award. *See, e.g.*, *Parsons & Whittemore Alabama Mach. & Servs. Corp. v. Yeargin Constr. Co.,* 744 F.2d 1482, 1484 (11th Cir. 1984).

## VII.   Nikola's Claim for Arbitration-Related Attorneys' Fees

███████████████████████████████████████████

███████████████████████████████████████ In the Interim Award, the Panel held that it could not decide the issue on the record before it and ordered the Parties to submit supplemental briefing addressing whether Nikola was entitled to seek these attorneys' fees in this Arbitration, and if so, under what authority.  (Interim Decision at 120).  Upon reviewing the Parties' additional briefing, we deny Nikola's request for attorneys' fees incurred in this Arbitration.

To start, the Parties disagree as to what law governs whether Nikola can recover these fees.  Under the AAA Commercial Arbitration Rules, arbitrators may award attorney' fees "if all parties have requested such an award or it is authorized by law or by the parties' arbitration agreement."  AAA Rule 47(d)(ii).  Here, both

Parties focus on whether Nikola is "authorized by law" to recover attorney' fees incurred in this Arbitration. ████████████████████████████.[25]



---

[25] ████████████████████████████████████████
████████████████████████████████████████
████████████████████████████ *Cf. Billie v. Coverall N. Am. Inc.*, 444 F. Supp. 3d 332, 353 (granting motion to compel arbitration against two plaintiffs and finding that arbitration agreements, one of which contained a fee-shifting clause and the other of which incorporated the AAA Commercial Rules, were not substantively unconscionable); *Sabre GLBL, Inc. v. Shan*, 779 F. App'x 843, 857-58 (3rd Cir. 2019) (applying the JAMS Policy on Employment Arbitration Minimum Standards of Procedural Fairness).  The Panel declines to award Nikola attorneys' fees incurred in this Arbitration based on the Parties' incorporation of the AAA Rules in their agreement to arbitrate.

Regardless, the Panel declines to award Nikola its attorneys' fees incurred in this Arbitration.[26] ███████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

██████████████████████ *Cantor Fitzgerald, L.P. v. Cantor*, 2001 WL 536911, at *3 (Del. Ch. May 11, 2001).[27]  This, by contrast, is not a case where the resulting harm to Nikola cannot be quantified—a fact evidenced by the Panel's award of various requested categories of damages to Nikola.

As a result, we deny Nikola's request for attorneys' fees incurred in this Arbitration.

## CONCLUSION

We understand there is a Dissent, Concurrence and Alternative Award by Panel member Jonathan J. Lerner, which is primarily focused on the allocation of fault. ████████████████████████████████████████

███████████████████████████████████████████████████

---

[26] ██████████████████████████████████████████████████ the Panel need not decide which state's law applies to Nikola's claim.

[27] *See also, e.g.*, *William Penn P'ship v. Saliba*, 13 A.3d 749, 759 (Del. 2011) (awarding attorneys' fees where plaintiffs otherwise would be unable to recover a typical damages award and without an award would be forced to bear the expenses of litigating a successful claim); *Metro Storage Int'l LLC v. Harron*, 275 A.3d 810, 867 (Del. Ch. 2022) (noting *Cantor Fitzgerald*'s exception to the American Rule "where a fiduciary has engaged in an egregious breach of the duty of loyalty, but the harm flowing from the breach was not readily capable of quantification." (internal quotation marks omitted)).

██████████████████████████████████ Furthermore, we find that Nikola's damages as awarded in this Decision and Award would not have occurred but for Milton's breach of fiduciary duty to Nikola.  As a result, we believe a 97% allocation to Milton for Nikola's recoverable damages is appropriate.  Based on the foregoing Decision, the Panel issues the following Award, set forth below.

**AWARD**

The Panel having considered the evidence presented on behalf of Nikola and Milton, the submissions of, and arguments by, counsel for the Parties and having reached the foregoing Decision, the Panel issues the following Award:

1.      Milton violated his fiduciary duties of loyalty and good faith to Nikola, which caused certain damages to Nikola, and is liable for those damages claimed by Nikola as described in the Decision;

2.      The Panel addresses Nikola's specific claims for damages as follows:

A.      Nikola's Claim to recover as damages in this Arbitration the legal fees ██████████████ ██████████ ████████████████████████ ████████████████████████████████████████████████████ ████████████, is denied without prejudice to seek such fees from such other arbitration panel at such time as the criminal proceeding is finally determined;

B.      On its claim to recover as damages the $125M fine it agreed to pay the SEC pursuant to the Consent Order, Nikola is awarded damages in the amount of $121,250,000 and the same proportion of any interest required by the Consent Order, subject to the following.  To date, Nikola has paid only $38,000,000, and therefore only $36,860,000 is due currently.  The additional damages awarded to Nikola for the SEC fine are due and payable by Milton within ten (10) days after Nikola pays additional amounts of the fine to the SEC;

126

C.     On its claims to recover compensatory damages for legal fees paid by Nikola we award the following;

(1)     As to █████, Nikola seeks to recover as damages all the legal fees it paid to █████, which total $32.102 million and were incurred in connection with ████████████████████████ and for the reasons described in the Decision, Nikola is awarded $31,138,940, or 97% of these fees.

(2)     As to ████████, Nikola seeks to recover as damages $3,252,000 in legal fees paid to ████████, ████████████ ████ ████████████ ████████████████████████, and for the reasons described in the Decision, Nikola is awarded $3,154,440, or 97% of these fees.  In rendering this award, however, we do so without prejudice to any potential future action or proceeding by Milton to seek the return, through indemnification or otherwise, of such payments based on the outcomes of these ████████████████.  This award is confined to the payments sought in this Arbitration and does not address whether Nikola is entitled to any future payments or to seek future payments.

(3)     As to ████████ Nikola seeks to recover as damages $21,000 for legal fees paid ████████ ████████████████████████ ████████████████, and for the reasons described in the Decision, Nikola is awarded $20,370, or 97% of these fees.  In rendering this award, however, we do so without prejudice to any potential future action or proceeding by Milton to seek the return,

through indemnification or otherwise, of such payments based on the outcomes of ███████████████████████. This award is confined to the payments sought in this Arbitration and does not address whether Nikola is entitled to any future payments or to seek future payments.

(4)    As to ██████████ Nikola seeks to recover as damages legal fees of $337,000 paid to ██████████ and for the reasons described in the Decision, Nikola is awarded $326,890, or 97% of these fees.

(5)    As to ██████████, Nikola seeks to recover as damages legal fees in the amount of $500,000 paid to ██████████, and for the reasons described in the Decision, Nikola is awarded $485,000, or 97% of these fees.

(6)    As to ██████████ Nikola seeks to recover as damages legal fees in the amount of $670,000 paid to ██████████, and for the reasons described in the Decision, Nikola's is awarded $649,900 or 97% of these fees.

(7)    As to ██████████ Nikola seeks to recover as damages legal fees in the amount of $416,000 paid to ██████████ and for the reasons described in the Decision, Nikola's request is granted in the amount of $403,520, or 97% of these fees.

(8)    As to ██████████, Nikola seeks to recover as damages legal fees in the amount of $313,000 paid to ██████████ and for the reasons

128



described in the Decision, Nikola's request is granted in the amount of $303,610 or 97% of these fees.

       D.    On its claims to recover compensatory damages for professional fees paid by Nikola, we award the following:

       (1)    As to ████████████ Nikola seeks to recover as damages $728,000 paid to ████████ ██████████████████████████████ ████████████████, and for the reasons described in the Decision, Nikola is awarded $706,160, or 97% of these fees.

       (2)    As to ██████████ Nikola seeks to recover as damages $564,000 paid to ██████████ ████████ ██████ ████ ████████ ██████████ ████████████████, and for the reasons described in the Decision, Nikola is awarded $547,080 or 97% of these fees.

       (3)    As to ████████ Nikola seeks to recover as damages the amount of $2,496,000 paid to ████████ ████████ ██████ ████████████████ ██████████████████████████████████████, and for the reasons described in the Decision, Nikola is awarded $2,421,120, or 97% of these fees.

       (4)    As to ██████ Nikola seeks to recover as damages the amount of $96,000 paid to ██████ ██████████████████████████████

███████, and for the reasons described in the Decision, Nikola is awarded $93,120 or 97% of these fees.

(5)     As to ███████, Nikola seeks to recover as damages the amount of $1,304,000 paid to ██████ ███████████████████████████ ████████████████████████████, and for the reasons described in the Decision, Nikola is awarded $1,264,880, or 97% of these fees.

(6)     As to ████████ Nikola seeks to recover as damages the amount of $2,404,000 paid ██████ █████ ████ ██████████ ██████████████████████, and for the reasons described in the Decision, Nikola is awarded $2,331,880, or 97% of these fees.

(7)     As to ███████ Nikola seeks to recover as damages the amount of $2,712,000 paid to █████ ███████████████████████ ███████████ █████ ██████████████████████, and for the reason described in the Decision, Nikola is awarded $2,630,640, or 97% of these fees.

E.     Nikola's claim for "disgorgement" damages is denied.

F.     Nikola's claim for legal fees and expenses incurred in this Arbitration is denied.

G.     Nikola is awarded prejudgment interest at an interest rate of 5.25% compounded quarterly from September 10, 2020 to August 4, 2023.

(1)     Nikola is not presently entitled to prejudgment interest on unpaid portions of the SEC fine.  Prejudgment interest on the outstanding amount of the SEC fine shall become due and payable as Nikola makes additional payments.

(2)     Nikola is entitled to prejudgment interest only on interest on the SEC fine it has already paid.  Nikola is not entitled to prejudgment interest on unpaid interest on the SEC fine.

H.     Nikola's request for post-judgment interest is denied without prejudice to Nikola seeking post-judgment interest if and when it moves a court to confirm and enter the Award.

3.     The ████████████████████████████████ 

████████ totaling $109,600.00 and the c ████████████████████████

████████ totaling $1,276,851.74 shall be borne equally.  Therefore, in addition to the other sums awarded above, Milton shall reimburse Nikola the sum of $28,275.00, representing that portion of said ████████████████████ in excess of the apportioned costs previously incurred by Nikola.

This Award is Final.

SO ORDERED BY THE PANEL:

Russ Fagg, Chair

Dan K. Webb, Panel Member

Dated: November 17, 2023

132