**WO**

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Nikola Corporation, | No. CV-23-02635-PHX-DJH |
| Petitioner, | **ORDER** |
| v. | |
| Trevor R Milton, | |
| Respondent. | |

In *Nikola Corporation v. Milton*, AAA Case No. 01-21-0017-196, the American Arbitration Association ("AAA") rendered an award in favor of Plaintiff Nikola Corporation ("Nikola") and against Defendant Trevor R. Milton ("Milton") for over $165 million due to Milton's breach of fiduciary duties.  (Docs. 1-1 (redacted version); 9 (unredacted version))[1] (the "Final Award").  Nikola filed in this Court a "Petition for Confirmation of Arbitration Award and For Entry of Judgment Thereon" (Doc. 1) under the Federal Arbitration Act, 9 U.S.C. § 1 *et seq.* ("FAA").  In response, Milton filed a Motion to Vacate (Doc. 20).[2]  The Court must decide whether vacatur is warranted under Section 10.[3]  For the following reasons, Milton's Motion is denied and Nikola's Petition is granted.

---

[1] The Court permitted the parties to file under seal the documents and information covered by the Confidentiality Order in the underlying arbitration proceedings, including the resulting arbitration awards.  (*See* Docs. 6; 8).

[2] The matter is fully briefed.  Plaintiff filed a Response (Doc. 31) and Milton filed a Reply (Doc. 32).

[3] Unless where otherwise noted, all Section references are to the FAA.

## I.     Background

Nikola is a manufacturer of electric vehicles.  (Doc. 1 at 2).  Milton is Nikola's founder.  (*Id*.)  Milton and served as Nikola's Chief Executive Officer and Executive Chairman until his resignation in 2020.  (*Id*.)

### A.     The Report

On September 10, 2020, a third-party issued a report called "Nikola: How to Parlay An Ocean of Lies Into a Partnership With the Largest Auto OEM in America" (Doc. 22-3) (the "Report").  The Report opined that "Nikola is an intricate fraud built on dozens of lies over the course of . . . Milton's career."  (*Id*. at 2).  The Report disclosed a list of "false and misleading statements made by Milton both before and after Nikola shares began trading publicly."  (Doc. 9 at 40–42 (quoting Doc. 22-3)).  This prompted various regulatory investigations by the United States Securities and Exchange Commission ("SEC") and the United States Attorney's Office as well as civil lawsuits (*Id*. at 46–47).

### B.     Milton's Resignation Under the Separation Agreement

On September 20, 2020, Milton offered to voluntarily step down from his role at Nikola.  (*Id*. at 46).  The terms of Milton's resignation were governed by the parties' "Separation Agreement" (Doc. 22-5).  Relevant to this matter are the Agreement's provisions for release of claims, indemnification and contribution, and arbitration of claims.  First, Nikola agreed to release Milton from "any and all claims, agreements, obligations, demands and any causes of action, known or unknown, suspected or occurring at any time and prior to and including the date the Company signs this Agreement . . . ."  (*Id*. at ¶ 8).  However, this release did not apply to "claims for fraud, securities laws violations, criminal acts or rights under or to enforce this Agreement, the Restrictive Covenants Agreement and the Lock-Up Agreement or any act for which [Milton] is not entitled to indemnification from the Company."  (*Id*.)

As to indemnification, Nikola agreed to comply with "all indemnification and advancement of expenses obligations it has pursuant to . . . the Indemnification

Agreement, dated as of June 3, 2020, by and between the Company and [Milton] (the 'Indemnification Agreement')."  (*Id*. at ¶ 4).  The referenced Indemnification Agreement (Doc. 22-6) requires Nikola to contribute to acts which Milton is not entitled to indemnification as follows:

> [Nikola], in lieu of indemnifying [Milton], shall contribute to the amount incurred by [Milton], whether for judgments, fines, penalties, excise taxes, amounts paid or to be paid in settlement and/or for Expenses, in connection with any claim relating to an indemnifiable event under this [Indemnification] Agreement, in such proportion as is deemed fair and reasonable in light of all of the circumstances of such Proceeding in order to reflect (i) the relative benefits received by [Nikola] and [Milton] as a result of the event(s) and/or transaction(s) giving cause to such Proceeding; and/or (ii) the relative fault of [Nikola] (and its directors, officers, employees and agents) and [Milton] in connection with such event(s) and/or transaction(s).

(*Id*. at ¶ 9) (the "Contribution Provision").

Last, the Separation Agreement included the following arbitration agreement:

> Except as prohibited by law, the Parties agree that any dispute as to the meaning, effect, performance or validity of this [Separation] Agreement or arising out of, related to, or in any way connected with, this [Separation] Agreement or any relationship between [Milton] and [Nikola] (or between [Milton] and any officer, director, employee or affiliates of [Nikola], each of whom is hereby designated a third party beneficiary of this [Separation] Agreement regarding arbitration) will be resolved through binding arbitration in Maricopa County, Arizona under the rules of the American Arbitration Association and the Arbitration Rules set forth in Arizona Rules of Civil Procedure.

(Doc. 22-5 at ¶ 20) (the "Arbitration Provision").

### C.    The Underlying Arbitration Proceedings

On November 3, 2021, Nikola initiated arbitration proceedings at the AAA against Milton for breach of fiduciary duty and various damages claims ("the Arbitration"). (Docs. 1 at ¶ 9); (9 at 7).  The Arbitration was held before the Honorable Russ Fagg, Mr. Jonathan J. Lerner, Esq., and Mr. Dan K. Webb, Esq. (together "the Panel").  In the

interim, Nikola entered into a settlement with the SEC on December 21, 2021, (Doc. 22-4) ("SEC Settlement") in which Nikola agreed to a $125 million fine (the "SEC Fine") to resolve certain claims against Nikola.  *See* Nikola Corp., Securities Act Release No. 11018, Exchange Act Release No. 93838 (Dec. 21, 2021).

After holding Arbitration Hearings from July 24–August 2, 2023 (Doc. 9 at 3), the Panel issued a Decision and Interim Award on October 20, 2023, (the "Interim Award") signed by a majority of the Panel—Judge Fagg and Mr. Webb (the "Majority").  (*Id.*) The Interim Award "invited the Parties to submit limited, additional briefing on: (1) Nikola's claim for legal fees and expenses in this Arbitration; (2) the amount of prejudgment interest Nikola could recover; and (3) the amount of post-judgment interest Nikola could recover."  (*Id.*)

On November 17, 2023, the Majority issued the Final Award in favor of Nikola, holding "Milton violated his fiduciary duties of loyalty and good faith to Nikola, which caused damages to Nikola, and that Milton is liable for certain of those damages claimed by Nikola."  (*Id.* at 9).  The Majority first applied Delaware law to find Milton violated his duties owed "through his pattern of false and misleading public statements about the Company and by subverting all efforts by individuals . . . to review and approve Milton's public statements in advance" and no equitable defenses applied.  (*Id.* at 59).  It then settled that there was no basis for Milton to receive indemnification under the Indemnification Agreement, but that he was entitled to contribution from Nikola based on the Contribution Provision.  (*Id.* at 60–79).  The Majority ultimately found Milton liable for 97% of the SEC Fine and certain legal and professional fees.  The Majority also "ascribe[d] some responsibility to Nikola, however, based on the Company's slowness to adopt more formal policies to stop these false and misleading statements from being published, when informal efforts to persuade and educate Milton consistently failed." (*Id.* at 94).  Accordingly, the Majority awarded Nikola a total of $167.7 million in damages as follows: $121.250 million for the SEC Fine, and approximately $46.477 million for legal and professional fees and expenses.  (*Id.* at 128–33).  Because Nikola

had only paid $38 million of the $125 million SEC Fine, the Majority ordered Milton to pay $83.337 million of the $167.7 million award, with payment of the remaining $84.363 million contingent on Nikola' paying the outstanding balance of the SEC Fine.  (*Id*. at 128).

Mr. Lerner dissented in a separate dissenting opinion, concurrence and alternative award (Docs. 1-2 (redacted version); 10 (unredacted version)) (the "Dissent").   The Dissent primarily addressed "the allocation required by the Separation Agreement and based on the 'relative fault' of Milton and the other Nikola Directors, Officers and Employees to arrive at a 'fair and reasonable' contribution to be made by Nikola." (Doc. 10 at 198).

Nikola has since petitioned this Court to confirm the Final Award under the FAA.  (*See generally* Doc. 1).  Milton filed a Motion to Vacate in response.  The Court must decide whether Milton has identified grounds for vacatur under the FAA.

## II.   The Federal Arbitration Act

The FAA provides district courts with jurisdiction to review arbitration awards. 9 U.S.C. §§ 9–12.   A party to an arbitration may apply to the Court for an order confirming the arbitration award, and the Court "must grant such an order unless the award is vacated, modified, or corrected as prescribed in sections 10 and 11 of [the FAA]." 9 U.S.C. § 9;  *See Stafford v. Baart Behavioral Health Servs*., 855 F. App'x 426, 427 (9th Cir. 2021) (granting an arbitration award because there were no grounds for vacatur).  "The [FAA] enumerates limited grounds on which a federal court may vacate, modify, or correct an arbitral award."  *Kyocera Corp. v. Prudential–Bache Trade Servs., Inc.*, 341 F.3d 987, 994 (9th Cir. 2003).  Section 10 authorizes vacatur in the following circumstances:

(1)   where the award was procured by corruption, fraud, or undue means;

(2)   where there was evidence of partiality or corruption in the arbitrators;

(3)   where the arbitrators were guilty of misconduct or misbehavior; or

(4)     where the arbitrators exceeded their powers or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made.

*Stafford*, 855 F. App'x at 427 (citing 9 U.S.C. § 10(a)(1)–(4)) (internal quotations omitted).

"The burden of establishing grounds for vacating an arbitration award is on the party seeking it." *U.S. Life Ins. Co. v. Superior Nat. Ins. Co.*, 591 F.3d 1167, 1173 (9th Cir. 2010). "[A]n award may be void in part, and good for the residue." *Comedy Club, Inc. v. Improv W. Assocs.*, 553 F.3d 1277, 1288 (9th Cir. 2009) (quoting *Lyle v. Rodgers*, 18 U.S. (5 Wheat.) 394, 409 (1820) ("[B]ut if that part which is void be so connected with the rest as to affect the justice of the case between the parties, the whole is void."). A district court's review of an arbitration award is "both limited and highly deferential." *Id.* The Ninth Circuit has held that "[a]lthough an arbitrator has great freedom in determining an award, he may not dispense his own brand of industrial justice." *Garvey v. Roberts*, 203 F.3d 580, 588–89 (9th Cir. 2000) (quoting *Pac. Motor Trucking Co. v. Auto. Machinists Union*, 702 F.2d 176, 177 (9th Cir. 1983)).

## III.   Discussion

The Panel's authority comes from the Arbitration Provision in Milton's Separation Agreement, which incorporates by reference the Indemnification Agreement and Contribution Provision therein. Milton advances two main arguments in his Motion to Vacate. First, Milton argues the Majority's ruling that he is 97% liable for the SEC Fine should be vacated because the Majority disregarded its obligation under the Contribution Provision when conducting its comparative fault analysis. (Doc. 21 at 11–15). Second, Milton contends the Majority's ruling that he is 97% liable for certain legal and professional fees should be vacated due to its inconsistency with the Contribution Provision, violation of procedural laws, and disregard of Delaware law. (*Id.* at 15–21). The Court will discuss each of Milton's arguments.

/ / /

### A.      Milton's 97% Liability for the SEC Fine

Milton first argues the Majority disregarded the Contribution Provision when ascribing him liability for the $125 million SEC Fine.  The Contribution Provision states in relevant part:

> [Nikola], in lieu of indemnifying [Milton], shall contribute to the amount incurred by [Milton] . . . *in such proportion as is deemed fair and reasonable* in light of all of the circumstances of such Proceeding in order to reflect . . . the relative fault of [Nikola] (and its directors, officers, employees and agents) and [Milton] in connection with such event(s) and/or transaction(s).

(Doc. 22-6 at ¶ 9) (emphasis added).  The issue is whether the Majority's allocation of fault to Milton represents a plausible interpretation of the Contribution Provision.

### 1.      Legal Standards

"If on its face, [an arbitration] award presents a plausible interpretation of the [underlying] contract, judicial inquiry ceases and the award must be enforced."  *Sovak v. Chugai Pharmaceutical Co.*, 280 F.3d 1266, 1271 (9th Cir. 2002); *see also Holly Sugar Corp. v. Distillery, Rectifying, Wine & Allied Workers International Union*, 412 F.2d 899, 903 (9th Cir. 1969).  A reviewing court has "no authority to vacate an award solely because of an alleged error in contract interpretation."  *Employers Ins. of Wausau v. Nat'l Union Fire Ins. Co.*, 933 F.2d 1481, 1485 (9th Cir. 1991). "As long as the arbitrator is even arguably construing or applying the contract and acting within the scope of his authority, that a court is convinced he committed serious error does not suffice to overturn his decision."  *Id.*

However, an "award that conflicts directly with the contract cannot be a 'plausible interpretation.' "  *Pac. Motor Trucking*, 702 F.2d at 177 (quoting *Federated Employers of Nevada, Inc. v. Teamsters Local No.*, 631, 600 F.2d 1263, 1265 (9th Cir. 1979)). "Although an arbitrator has great freedom in determining an award, he may not" "disregard[] a specific contract provision to correct what he perceived as an injustice."  *Id.* (citing *United Steelworkers of Am. v. Enterprise Wheel & Car Corp.*, 363 U.S. 593,

597 (1960)); *Aspic Eng'g & Constr. Co. v. ECC Centcom Constructors LLC*, 913 F.3d 1162, 1168 (9th Cir. 2019) ("What an arbitrator may not do, however, is disregard contract provisions to achieve a desired result.").

### 2.    The Parties' Arguments

Milton argues the Majority failed to conduct a "fair and reasonable" comparative fault analysis despite recognizing its obligation do so.  (Doc. 21 at 12–13).  He points out the SEC Settlement set forth three categories of allegations—"(i) Nikola was liable for allowing Mr. Milton to make statements alleged to be misleading; (ii) Nikola was liable for false statements made by Nikola, independent of any statements by Mr. Milton; and (iii) Nikola was liable for failing to establish adequate internal controls" (*Id*. at 13 (citing Doc. 22-4 at ¶¶ 17–40))—yet the Majority only focused on the first category in its analysis.  (Docs. 21 at 13; 32 at 4–5).  Milton reasons that by ascribing to him 97% of fault for the SEC Fine, the Majority did not fairly reflect the relative fault of others and imposed "its own sense of 'rough justice[.]' " (Doc. 21 at 15).

Nikola opposes, arguing that "[b]y allocating 97% of fault to Milton instead of the 100% sought by Nikola, the Majority clearly acted within the scope of its authority and in a manner consistent with their interpretation of the Contribution Provision. (Doc. 31 at 11).    Nikola maintains the Majority "devoted nearly 30 pages explaining why Nikola was entitled to recover the portion of the SEC Fine and the Fees that the Majority attributed to Milton's misconduct."  (*Id*. (citing Doc. 9 at 83–112)).  It further contends Milton's disagreement with the Majority's weighing of evidence does not justify vacatur because Section 10 does not allow for judicial review of the merits of the Final Award.  (Doc. 31 at 12).  The Court agrees with Nikola.

### 3.    The Majority's Analysis

The Majority began its discussion of the Contribution Provision by determining the Provision was enforceable under federal law notwithstanding Milton's breach of fiduciary duty.  (Doc. 9 at 61–79).  It then found that "Milton is entitled to contribution in accordance with Paragraph 9 of the Indemnification Agreement," and "Nikola shall

contribute based on the relative fault of Milton and the Company, its Officers and Directors for any damages it seeks to recover in this Arbitration." (*Id.* at 79). The Majority proceeded to evaluate Nikola's various claimed damages. It found Milton responsible for 97% of the SEC Fine (*id.* at 85–100), and attributed the remaining 3% fault to Nikola due to its failure to implement adequate internal controls to prevent or otherwise stop the false and misleading statements at issue from being published. (*Id.* at 94 ("We ascribe some responsibility to Nikola, however, based on the Company's slowness to adopt more formal policies to stop these false and misleading statements from being published, when informal efforts to persuade and educate Milton consistently failed.")).

The Court finds the Majority's ruling represents a plausible interpretation of the Contribution Provision. First, Milton misrepresents the scope of the Majority's analysis when arguing it failed to consider certain categories of allegations in the SEC Settlement. When evaluating comparative fault for the SEC Fine, the Majority indeed identified that the SEC Settlement was "based on three separate and independent categories of violation of the securities laws and SEC Rules and Regulations, and all are asserted against Nikola." (Doc. 9 at 90). The Majority made clear that its analysis largely focused on the first category regarding Milton's statements because the SEC characterized these allegations as the "primary" claims alleged. (*Id.* (quoting Doc. 22-4 at ¶¶ 20–34)). The Majority acknowledged the second category regarding Nikola's independent statements and reasoned "that Nikola can only act through its officers and directors, and Milton's actions played a prominent role in certain of the claims alleged by the SEC." (*Id.* at 90 ("Indeed, in the [SEC Settlement,] the SEC alleged that 'Nikola violated Section 10(b) of the Exchange Act and 13a-15(a) thereunder and Section 17(a) of the Securities Act,' and 'Nikola primarily misled investors through scores of misrepresentations by its CEO and later Executive Chairman Trevor R. Milton.'") (quoting Doc. 22-4 at ¶¶ 2, 4) (internal citations omitted)). To the extent Milton seeks to require the Majority to engage in a more detailed discussion of its reasoning behind the "Nikola-specific allegations" in the

SEC Settlement, the Majority was under no such duty.  *See Bosack v. Soward*, 586 F.3d 1096, 1104 (9th Cir. 2009) ("Arbitrators are not required to set forth their reasoning supporting an award" and their  "award may be made without explanation of their reasons and without a complete record of their proceedings.")  (citations omitted).  Last, the Majority expressly considered the allegations regarding Nikola's inadequate internal controls under the third category and ascribed 3% liability to Nikola for such failures. (Doc. 9 at 94).  The Majority clarified that it took into account the "actions and inactions of Nikola's board of directors and senior officers to address Milton's improper conduct" and "simply weigh[ed] the evidence differently than [the Dissent.]"  (*Id*. at 94–95).  Thus, there is no evidence that the Majority's comparative fault analysis of the SEC Fine directly contradicted the Contribution Provision based on its discussion of the SEC Settlement.

Second, the Court is unpersuaded by Milton's supporting authorities.  Milton cites to four cases to assert the Majority imposed its own sense of "rough justice" when ascribing Milton 97% liability.  (Doc. 21 at 15).  However, those cases are distinguishable because they concern proceedings where the arbitrators either expressly refused to enforce the parties' contractual provisions or altered the terms of a provision. *See Aspic*, 913 F.3d at 1168 (affirming vacatur because even though the arbitrator recognized the underlying contract required the arbitration to comply with certain Federal Acquisition Regulations, the Arbitrator found the appellant "was not held to the[se] strict provisions"); *United Food & Com. Workers Union, Loc. 1119, AFL-CIO v. United Markets, Inc*., 784 F.2d 1413, 1416 (9th Cir. 1986) (affirming vacatur because the arbitrator's resolution " 'add [ed] to' the terms of the agreement—an effect forbidden by . . . the main agreement"); *Pac. Motor Trucking Co.*, 702 F.2d at 177 (affirming vacatur because the arbitrator acknowledged the underlying contract "gave the company discretion over the [employee] position" but "[n]onetheless . . . ruled that the company could not demote [the employee] from [the position] because to do so would be 'unreasonable and unconscionable' "); *Coast Trading Co. v. Pac. Molasses Co*., 681 F.2d

1195, 1197 (9th Cir. 1982) (affirming vacatur because the underlying contract provided for a certain delivery date, yet the arbitrators and appeals committee extended that date by some years). The Majority engaged in no such comparable conduct. The Majority found the Contribution Provision enforceable, and applied it to allocate 97% of the SEC fine to Milton and the remaining 3% to Nikola. The Majority's comparative fault analysis presents a plausible interpretation of the Contribution Provision and will be enforced. *See Sovak*, 280 F.3d at 1271.[4]

Furthermore, Milton's argument that the Majority did not carry out its comparative fault analysis of the SEC Fine in a "fair and reasonable manner" invokes a judicial review of the merits. Section 10 prohibits the Court from doing so. *Biller v. Toyota Motor Corp.*, 668 F.3d 655, 664 (9th Cir. 2012) ("[Section] 10 of the FAA provides no authorization for a merits review."). The Court agrees with Nikola that the Majority acted within its scope of authority when interpreting and applying the Contribution Provision. (Doc. 31 at 11 (citing *Mike Rose's Auto Body, Inc. v. Applied Underwriters Captive Risk Assurance Co., Inc*., 389 F. Supp. 3d 687 (N.D. Cal. 2019)); *see also See Employers Ins. of Wausau*, 933 F.2d at 1485. Even if the Majority erroneously interpreted the Contribution Provision, "[a] reviewing court has 'no authority to vacate an award solely because of an alleged error in contract interpretation.'" *Employers Ins. of Wausau*, 933 F.2d at 1485. Milton's insistence that the Dissent conducted the better comparative fault analysis does not warrant vacatur. Neither does his disagreement with the outcome of the Majority's comparative fault analysis. *See Bosack*, 586 F.3d at 1104 (requiring there be "some evidence in the record, other than the result, that the arbitrators were aware of the law and intentionally disregarded it").

### B.    Milton's 97% Liability for Legal and Professional Fees

Milton next argues the Majority's ruling that he is liable for 97% of certain legal

---

[4] Notably, Milton cites to non-binding, out-of-circuit precedent to urge "an arbitrator cannot shield himself from judicial correction by merely making noises of contract interpretation." (Doc. 32 at 3 (citing *Anheuser-Busch, Inc. v. Beer, Soft Drink, et al*., 280 F.3d 1133, 1138 (7th Cir. 2002)). Milton fails to argue the plausible interpretation standard recognized in this circuit.

and professional fees requires vacatur for four reasons: (1) like the SEC fine, the Majority failed to conduct a comparative fault analysis for the fees as required by the Contribution Provision; (2) the ruling is premised on evidence admitted in violation of applicable procedural laws and to Milton's prejudice; and (3) the ruling disregards Delaware law.

### 1.   Assessment of Comparative Fault Under the Contribution Provision

Milton asserts that the Majority disregarded the Contribution Provision when ascribing him liability for legal and professional fees because it failed to conduct a "fair and reasonable" comparative fault analysis.  (Doc. 20–21).  The Court has already settled the Majority's allocation of 97% responsibility for the SEC Fine to Milton constituted a plausible interpretation of the Contribution Provision.  *See supra* Section III.A.  The Court will conduct the same evaluation of the legal and professional fees.

As explained, the Majority applied the Contribution Provision in the Final Award—it did not expressly refused to enforce the Provision or altered the terms of the Provision.  *See supra* Section III.A(3).  In addition to the SEC Fine, the Majority examined each of the following fee categories Nikola claimed it incurred as a result of Milton's misconduct:

> (1)   legal fees incurred when defending Milton in his criminal action in the Southern District of New York;

> (2)   legal fees paid to law firm Kirkland & Ellis for services related to relevant government investigations, securities and derivative litigations, corporate governance advice in  response to the  Report, and separate and arbitration proceedings;

> (3)   professional fees and expenses incurred that relate to law firm Kirkland & Ellis; and

> (4)   legal expenses incurred for law firms that represented Nikola's officers, directors, and employees

(Doc. 9 at 79–85, 95–113).  Upon doing so, the Majority declined to award damages

connected to Milton's criminal action and the separate arbitration proceedings. (*Id*. at 79–85). However, the Majority found Milton 97% responsible for the other legal fees and professional services that Nikola incurred. The Majority ascribed the remaining 3% fault to Nikola for its failure to implement adequate internal policies. (*Id*. at 94).

Milton contends the Majority's comparative fault analysis did not comply with the Contribution Provision because the Majority "swept into its damages award . . . services that were clearly attributable to Nikola and its employees, officers, and directors." (Doc. 21 at 21). The Majority specifically addressed this point as follows:

> Although K&E's representation involved the failure of the Nikola Board and senior management to adopt and implement certain policies at issue, the SEC investigation was still directed to Milton's false statements on social media. Accordingly, Milton cannot escape liability for the K&E fees. As to the fees relating to Nikola's public filings, here too the Panel cannot ignore the reality that the SEC's "primary claims" centered entirely on Milton's false statements, which precipitated the investigation and without which the SEC may have determined not to investigate Nikola.

(Doc. 9 at 99). Based on the foregoing, The Majority's comparative fault analysis as it relates to fees presents a plausible interpretation of the Contribution Provision and will be enforced. *See Sovak*, 280 F.3d at 1271. Like his arguments regarding the SEC Fine, Milton merely disagrees with the outcome of the Majority's comparative fault analysis and insists that the Dissent got it right. Such conclusory arguments are insufficient to justify vacatur. *See Bosack*, 586 F.3d at 1104.

Nikola's point is well taken that by asking the Court to vacate the Majority's allocation of fault for certain fees, Milton asks the Court to review and overturn the Majority's factual findings and legal conclusions regarding causation and damages. (Doc. 31 at 20). To do so is beyond the scope of the Court's review under the FAA. *Bosack*, 586 F.3d at 1102 ("Neither erroneous legal conclusions nor unsubstantiated factual findings justify federal court review of an arbitral award.").

### 2.    Admission of Unredacted Invoices

Milton next argues the Majority's award of certain legal and professional fees

requires vacatur because it was premised on unredacted invoices that were admitted in violation of the applicable procedural rules and to his prejudice.   The Arbitration Provision in Milton's Separation Agreement provided that all covered disputes "will be resolved . . . under the rules of the American Arbitration Association [(AAA Rules)]and the Arbitration Rules set forth in Arizona Rules of Civil Procedure [(Arizona Rules)]." (Doc. 22-5 at ¶ 20).  Arizona Rules 72–77 apply to arbitration proceedings.  *See* Ariz. R. Civ. P. 72–77.   Relevant here, Arizona Rule 75 states that "[u]nless the parties agree otherwise or the offering party shows good cause, no witness or exhibit may be offered at the hearing other than those listed and exchanged."  Ariz. R. Civ. P. 75(b)(3).  AAA Rule R-34(a) further provides:

> The parties may offer such evidence as is relevant and material to the dispute and shall produce such evidence as the arbitrator may deem necessary to an understanding and determination of the dispute. Conformity to legal rules of evidence shall not be necessary. All evidence shall be taken in the presence of all of the arbitrators and all of the parties, except where any of the parties is absent, in default, or has waived the right to be present.

AAA Rule R-34(a).

### a.      The Redacted and Unredacted Invoices

The panel discussed the issue of evidence relating to causation and damages throughout the Arbitration Hearings.  (*See generally* Doc. 23-2).  The Panel initially indicated that Nikola's submission of various redacted invoices[5] may pose a "proof problem" when it was "asking for damages based on redacted invoices and there's a question about whether the work was causally related to Milton's actions." (Doc. 23-2 at 65).  Nikola then moved to admit the unredacted invoices, which the Panel granted over Milton's objections under Arizona Rule 75.[6]  (*Id*. at 70–74).

---

[5] Milton provided copies of these redacted invoices at Docs. 23-9; 23-10; 24-1; 24-2; 24-3; 24-4; 24-5; 24-6; 24-7; 24-8; 24-9; 24-10; 25-1; 25-2; 25-3; 25-4; 25-5; 25-6; 25-7; 25-8; 25-9; 25-10; 26-1; 26-2; 26-3; 26-4; 26-5; 26-6; 26-7; 26-8; 26-9; 26-10; 27-1; 27-2; and 27-3.

[6] At the July 25, 2023, Hearing, Milton also objected under AAA Rule 32, which states that all parties must be treated equally.  (Doc. 23-2 at 73).

1       Milton's position is that Arizona Rule 75 required Nikola to identify and provide

2  Mr. Milton with any exhibits in intended to use at the Hearings ten days prior, yet Nikola

3  moved to admit unredacted invoices that had never been previously disclosed on the third

4  day of the Hearings. (Doc. 21 at 18). Milton reasons the Panel's admission clearly

5  violated the procedural rules the parties designated to govern the Arbitration and also

6  prejudiced his ability to review the exhibits. (*Id.* at 19). He further maintains Nikola did

7  not make any good cause argument under Arizona Rule 75 at the time the exhibits were

8  admitted. (Doc. 32 at 6–7).

9       Nikola opposes, arguing the parties' agreed that both the AAA Rules and the

10  Arizona Rules should apply, not just the Arizona Rules. Nikola further contends the

11  AAA rules provide arbitrators with "wide discretion with regard to the conduct of the

12  proceedings, the exchange of evidence, and whether to admit or exclude evidence.

13  (Doc. 31 at 15) (citing AAA Rules R-35(a), R-35(b)). Nikola reasons the Panel acted

14  within its scope of discretion provided by the parties' Arbitration Provision when it

15  admitted the unredacted invoices. (*Id.* at 15–16).

16       **b.**     **The Panel Did Not Abuse Their Discretion**

17       To start, the Court agrees with Nikola that the parties contracted for both the

18  Arizona Rules and the AAA Rules to govern. Judge Fagg indeed reiterated in an email to

19  the parties that both procedural bodies of law would govern proceedings:

20
21      The July 8, 2022, Scheduling Order, specifies the "rules of the American
       Arbitration Association [("the AAA Rules")] and the Arbitration Rules set
22      forth in [the] Arizona Rules of Civil Procedure" [("Arizona Rules")] apply.
       The September 20, 2020, Separation Agreement specify the applicable law
23      would be the American Arbitration Act and the "Arbitration Rules set forth
       in the Arizona Rules of Civil Procedure". Thus, the panel will follow the
24      Arizona Rules of Civil Procedure, and, as needed, will look to the rules of
       the American Arbitration Association and the American Arbitration Act for
25      guidance.
26

27  (Doc. 23-3 at 2). Milton's statement that the AAA Rules are "of no relevance" is

28  unavailing. (Doc. 32 at 6). Contrary to Milton's position, Arizona Rule 75 is not the

only evidentiary rule the parties agreed to govern regarding production of evidence. AAA Rule R-34 provides "[t]he parties may offer such evidence as is relevant and material to the dispute and shall produce such evidence as the arbitrator may deem necessary to an understanding and determination of the dispute." And the Ninth Circuit has recognized that arbitrators must provide "each of the parties to the dispute an adequate opportunity to present its evidence and arguments" but otherwise enjoy "wide discretion to require the exchange of evidence, and to admit or exclude evidence, how and when they see fit." *U.S. Life Ins.*, 591 F.3d at 1175 (internal quotations and citations omitted).

Here, the Panel considered arguments from both parties regarding admission of the unredacted invoice and took note that the underlying redacted versions were admitted and timely exchanged. (Doc. 23-2 at 70). The Panel also stated they "appreciate[d] the difficulty that [Milton] was put in by the late disclosure . . . . However, we thought it would be best to have the exhibits admitted and if [Milton] want[s] to make argument over the next three weeks, [Milton was] going to be allowed to." (Doc. 31-1 at 67). This evidence was admitted in the presence of all parties and Milton was given multiple opportunities to argue against admission both during and after the Hearings. In light of the wide discretion afforded to arbitrators by Ninth Circuit in handling evidentiary matters, the Court finds no evidence that the Panel violated the AAA Rules or Arizona Rules when admitting the unredacted invoices.

### c.    Harmless Error

Alternatively, whether or not the Panel's decision to admit the unredacted invoices violated the applicable procedural laws is a non-issue because the Panel expressly stated it did not independently consider the unredacted invoices when reaching its conclusion on causation and damages:

> In deciding Milton's false and misleading statements caused Nikola to incur these legal and profession services fees, the Panel has relied primarily on [Nikola's Chief Legal Officer Britton] Worthen's testimony. Although the Panel has reached this decision largely based on Worthen's testimony, the

Panel has considered invoices, previously produced by Nikola as redacted and subsequently unredacted during the hearing, in further support of the testimony. *The Panel has not relied on these unredacted invoices as independently demonstrating causation.*

(Doc. 9 at 95 n.19) (emphasis added).   Thus, even if the Court were to find the Panel erred under the procedural rules, such error would be harmless because the unredacted invoices were not material to the Final Award's causation analysis.   *See e.g.*, *Coutee v. Barington Capital Grp.*, L.P., 336 F.3d 1128, 1134 (9th Cir. 2003) (finding that the arbitrator's failure to apply a choice of law provision was not grounds for vacatur because such error was harmless) (citing *Barnes v. Logan*, 122 F.3d 820, 823 (9th Cir. 1997)). The Panel based its decision that Milton's false and misleading statements caused Nikola to incur these legal and profession service fees on relevant testimony.   (Doc. 9 at 95 n.19).   The Court will defer to the Panel's statements in the Final Award.   *Comedy Club*, 553 F.3d at 1288 (A district court's review of an arbitration award is "both limited and highly deferential").

### 4.  Causation Under Delaware Law

Last, Milton argues the Majority's award of certain legal and professional fees requires vacatur because it failed to conduct the requisite causation assessment.   He argues the Panel acknowledges its obligation to do so under of Delaware law, "but failed to prove that specific fees covered by each invoice were attributable to Mr. Milton." (Doc. 21 at 20).   Nikola opposes, arguing Milton mischaracterizes the requirements of Delaware law, which "eschews strict requirements of but-for and proximation cause [] and instead applies a loosened, flexible causation standard [] when assessing damages in breach of fiduciary duty cases, and resolves any doubts as to damages against the tortfeasor." (Doc. 31 at 19 (citing Doc. 9 at 109).   Nikola further maintains the issue of causation was extensively argued, briefed, and thoroughly addressed in the Final Award. (*Id.* at 18 (citing Doc. 9 at 96–100, 102–110, 126–127)).

### a.  Standard for Manifest Disregard

Arbitrators "exceed their powers" under Section 10(a)(4) when the resulting award

is in "manifest disregard of the law" or "completely irrational." *Comedy Club*, 553 F.3d at 1288. Manifest disregard of the law "means something more than just an error in the law or a failure on the part of the arbitrators to understand or apply the law." *Luong v. Circuit City Stores, Inc.*, 368 F.3d 1109, 1112 (9th Cir. 2004). Rather, "it must be clear from the record that the arbitrators recognized the applicable law and then ignored it." *Id.*; *Stolt-Nielsen S. A. v. AnimalFeeds Int'l Corp.*, 559 U.S. 662, 672 n.3 (2010) ("[The standard requires a] showing that the arbitrators 'knew of the relevant legal principle, appreciated that this principle controlled the outcome of the disputed issue, and nonetheless willfully flouted the governing law by refusing to apply it.").

The manifest disregard standard "afford[s] an extremely limited review authority, a limitation that is designed to preserve due process but not to permit unnecessary public intrusion into private arbitration procedures." *Kyocera Corp.*, 341 F.3d at 997. "The risk that arbitrators may construe the governing law imperfectly in the course of delivering a decision that attempts in good faith to interpret the relevant law, or may make errors with respect to the evidence on which they base their rulings, is a risk that every party to arbitration assumes, and such legal and factual errors lie far outside the category of conduct embraced by § 10(a)(4)." *Id*. at 1003. "[T]o demonstrate manifest disregard, the moving party must show that the arbitrator 'underst[oo]d and correctly state[d] the law, but proceed [ed] to disregard the same.' " *Bosack*, 586 F.3d at 1104 (quoting *Collins v. D.R. Horton, Inc.*, 505 F.3d 874, 879 (9th Cir. 2007)). "Neither erroneous legal conclusions nor unsubstantiated factual findings justify federal court review of an arbitral award." *Id*. at 1102. Indeed, "[Section] 10 of the FAA provides no authorization for a merits review." *Biller*, 668 F.3d at 664. There "must be some evidence in the record, *other than the result*, that the arbitrators were aware of the law and intentionally disregarded it." *Bosack*, 586 F.3d at 1105 (emphasis added) (citation omitted).

### b.      The Majority's Analysis

Milton concedes in his Motion to Vacate that the Panel, "consistent with Delaware law," emphasized to Nikola the importance of establishing causation when seeking

Damages.  (Doc. 21 at 16–17).  The Panel certainly did so throughout the Arbitration Hearings.  (*See* Doc. 23-2 at 5 ("At the end of the day, this panel needs to decide if there's liability, if there's causation, and if there's damages. You can't just put a $ 78 million bill in front of us and say we want $78 million. You have to prove that has to do with the breach of fiduciary duty and that it caused damages. So I'm going to leave it at that. It's your burden of proof."))); (*id.* (at 65–66 ("[A]s I mentioned to claimants, when they're asking for damages based on redacted invoices and there's a question about whether the work was causally related to Milton's actions, I think there's a proof problem that they're going to have to convince the panel that those invoices were caused by Milton's actions; therefore, Nikola can get damages. To me there's a proof problem there with redacted invoices."))).  The Panel also reiterated the standards for causation under Delaware law in the Final Award as follows: "a duty of loyalty breach loosen[s] the stringent requirements of causation and damages. Any uncertainty in awarding damages is resolved against the wrongdoer."  (Doc. 9 at 109 (quoting *Hampshire Group, Ltd v. Kuttner*, 2010 W.L. 2739995 at *35 (Del. Ch. 2010)).

The following excerpts are non-exclusive examples of how the Majority considered causation under Delaware law:

- In reaching our determination, we cannot accept the position that Milton's falsehoods did not cause the Hindenburg Report. Any doubt that Milton's falsehoods caused the Hindenburg Report is demolished by the first bullet in the Hindenburg Report itself, which states, "Today we reveal why we believe Nikola is an intricate fraud built on dozens of lies over the course of its Founder and Executive Chairman Trevor Milton's career."  The second bullet reinforces the point: "We have gathered extensive evidence—including recorded phone calls, text messages, private emails and behind-the-scenes photographs—detailing dozens of false statements by Nikola Founder Trevor Milton. We have never seen this level of deception at a public company especially of this size." Likewise, the commencement of the class actions on September 15, 2020—only five days after publication of the Hindenburg Report—speaks volumes about the cause of the class actions. For the foregoing reasons, we conclude that Nikola is entitled to recover most of the

legal fees (apportioned 97% to 3%, as explained elsewhere) it expended on K&E, Paul Weiss, and Wilenchik to represent Nikola in the class action and derivative litigations, as reflected in the invoices submitted in this Arbitration.  (Doc. 9 at 104) (citations omitted).

- As we have already discussed, on its face, the Hindenburg Report was aimed directly at falsehoods disseminated by Milton and asserted that Nikola was a sham company.  In this context, the record evidence establishes direct linkage from Milton's breaches of fiduciary duty to the publication of the Hindenburg report and to Nikola's need to retain crisis management expertise to deal with the fallout of Milton's numerous false and misleading public statements. (*Id.* at 108–109).

- The record demonstrates that [Chief Financial Officer Kim] Brady's need for separate counsel was caused by Milton's statements.  Accordingly, Milton is responsible for 97% of the bills Nikola paid to King & Spaulding to represent Brady.  (*Id.* at 113).

Milton is correct that the Majority did not go line by line through the supporting invoices and expressly state whether each fee was attributable to Mr. Milton.  (Doc. 21 at 20).  But the Majority was not required to do so.  *Bosack*, 586 F.3d at 1104 ("Arbitrators are not required to set forth their reasoning supporting an award.  An arbitrators' 'award may be made without explanation of their reasons and without a complete record of their proceedings.'") (quoting *Wilko v. Swan*, 346 U.S. 427, 436 (1953)).  And even if the Majority failed to make explicit findings, "this does not warrant vacatur." *Id*.  Milton's assertion that the Majority "simply held" that Mr. Milton was liable for 97% of fees without any analysis is insufficient to meet the extremely high burden to prove an arbitrator disregarded the law.

**IV.    Conclusion**

In sum, Milton has not demonstrated any circumstance warranting vacatur of the Final Award under Section 10.  The Majority's findings that Milton is 97% responsible for the SEC Fine and certain legal and professional fees represent a plausible interpretation of the Contribution Provision.  The Majority's allocation of fault as to legal

and professional fees does not disregard the applicable procedural rules or Delaware law. The Court must therefore grant Nikola's Petition to confirm the Final Award under Section 9. *See Stafford*, 855 F. App'x at 427.

Accordingly,

**IT IS HEREBY ORDERED** that Defendant Trevor R. Milton's Motion to Vacate or Modify (Doc. 20) is **DENIED**.

**IT IS FURTHER ORDERED** that Plaintiff Nikola Corporation's "Petition for Confirmation of Arbitration Award and For Entry of Judgement Thereon" (Doc. 1) is **GRANTED**.  The Clerk of the Court is kindly directed to enter judgment on the Award (Doc. 9) under 9 U.S.C. § 13.

Dated this 9th day of September, 2024.

Honorable Diane J. Humetewa
United States District Judge